GEORGE T. FLOWERS AND DONNA FLOWERS, ET AL.,[1] PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 8315–80, 8336–80, 8417–80—8419–80.    Filed May 16, 1983.

[1]Cases of the following petitioners are consolidated herewith: Cary A. Williams and Suzanne M. Williams, docket No. 8336–80; Charles J. Crist and Nancy L. Crist, docket No. 8417–80; William J. McCallie and Charlotte W. McCallie, docket No. 8418–80; and Richard L. Peck and Evelyn K. Peck, docket No. 8419–80.

*William Randolph Klein*, for the petitioners.
*Robert J. Shilliday, Jr.*, for the respondent.

STERRETT, *Judge*: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes as follows:

| Docket No. | Petitioner | TYE Dec. 31— | Deficiency |
|---|---|---|---|
| 8315–80 | George T. Flowers | 1974 | $1,078.00 |
| | and Donna Flowers | 1976 | 5,629.00 |
| | | 1977 | 828.00 |
| 8336–80 | Cary A. Williams | 1976 | 7,101.62 |
| | and Suzanne M. Williams | 1977 | 10,773.18 |
| 8417–80 | Charles J. Crist | 1977 | 4,072.75 |
| | and Nancy L. Crist | | |
| 8418–80 | William J. McCallie | 1976 | 7,177.00 |
| | and Charlotte W. McCallie | 1977 | 6,503.00 |
| 8419–80 | Richard L. Peck | 1976 | 7,330.41 |
| | and Evelyn K. Peck | 1977 | 6,347.01 |

After various concessions, the issues for decision are (1) whether the master recording acquisition and leaseback arrangement constituted a genuine multiparty transaction with economic substance; (2) whether the activities conducted by Levon Records, Ltd., were engaged in for profit; (3) whether certain nonrecourse indebtedness should be included in the bases of petitioners' partnership interests; (4) the time that the master recordings here at issue were placed in service; (5) whether such recordings constitute tangible personal property; (6) the useful lives of the recordings; and (7) whether petitioners are entitled to accrued interest deductions generated by the nonrecourse indebtedness.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioners George T. and Donna Flowers resided in Sarasota, Fla., at the time of filing the petition herein. Petitioners Cary A. and Suzanne M. Williams resided in Tampa, Fla., at the time of filing the petition herein. Petitioners Charles J. and Nancy L. Crist resided in St. Petersburg, Fla., at the time of filing the petition herein. Petitioners William J. and Charlotte W. McCallie resided in Tampa, Fla., at the time of filing the petition herein. Petitioners Richard L. and Evelyn K. Peck resided in Odessa, Fla., at the time of filing the petition herein. All petitioners filed their respective returns for the years in issue with the Office of the Internal Revenue Service, Chamblee, Ga.

## The Promotion of Levon Records

On July 25, 1976, Robert S. Spencer (Mr. Spencer) and Ralph P. Lebkuecher (Mr. Lebkuecher) began promotional efforts to secure at least six limited partners in a proposed Florida limited partnership to be known as Levon Records, Ltd. (hereinafter Levon Records). The confidential descriptive memorandum supplied by Mr. Spencer and Mr. Lebkuecher to potential limited partners between July 24, 1976, and September 13, 1976, stated that they intended to sell an aggregate of $160,000 of limited partnership interests in Levon Records. The memorandum further provided that, unless $96,000 in limited partnership interests were sold by November 30, 1976, Levon Records would not be created and the moneys paid to Mr. Spencer and Mr. Lebkuecher would be refunded. Levon Records was to acquire four master tape recordings, and distribute and sell the records pressed from the master tapes. As proposed, the master recordings were to cost the partnership $269,125 each, for a total of $1,076,500. Of this amount, Levon Records was required to pay only $34,125 in cash for each master tape, or a total cash downpayment of $136,500. The remainder of the purchase price was to be satisfied with a 12-year nonrecourse note in the face amount of $940,000. The note was to be secured by a first lien security interest in the

records and payable only out of profits derived from the sale of records. The $160,000 to be collected from the limited partners of Levon Records was to be used as follows:

| | |
|---|---|
| Cash payment for master tapes | $136,500 |
| Working capital | 10,000 |
| Legal fee | 12,500 |
| Accounting fee | 1,000 |
| Total | 160,000 |

The confidential descriptive memorandum warned that there was "no assurance that the distributor will fulfill his obligation under the Distribution Agreement." Even if such obligation were fulfilled, there was "no representation or warranty as to the marketability of the Records." In addition, the memorandum provided that "The Partnership is relying upon Robert H. Stobaugh and Jesse Prater to manage the Partnership. Mr. Stobaugh and Mr. Prater have no experience in the production and distribution of phonograph records." The memorandum further stated that "Neither the Partnership, the General Partners, nor any affiliates of a General Partner * * * or any advisor or representative of any of the foregoing assumes any responsibility for the tax consequences of this transaction to a Limited Partner." Finally the memorandum provided:

Proposed investors considering investing in this Partnership should understand there is a risk that the information tax return of the Partnership and the tax returns of the Limited Partners may be audited by the Internal Revenue Service, and that upon such audit all or a substantial part of the deductions may be disallowed. Such a result would substantially reduce the tax benefits, if any, of investing in the Partnership. Contesting any Internal Revenue Service challenge may impose significant legal expense on Limited Partners, which expenses will be the responsibility of the individual Limited Partner.

On September 13, 1976, an amended confidential descriptive memorandum was supplied by Mr. Spencer and Mr. Lebkuecher to potential and existing limited partners of Levon Records. The amended memorandum is basically identical to the original memorandum with several exceptions.[2]

---

[2]For instance, the amended version deleted the heading of a paragraph which stated: "Distribution Not Necessarily Profitable."

*Formation of Levon Records*

Petitioners each agreed to become limited partners in Levon Records on the following dates, made payments to Levon Records in the following amounts, and thereby acquired the following interests in Levon Records:[3]

| Petitioner | Date of agreement | Payment to Levon Records | Interest in Levon Records |
|---|---|---|---|
| Flowers | Oct. 29, 1976 | $7,000 | 4.156% |
| Williams | Aug. 16, 1976 | 8,000 | 4.750 |
| Crist | Nov. 29, 1976 | 5,000 | 2.969 |
| McCallie | Oct. 29, 1976 | 8,000 | 4.750 |
| Peck | Aug. 18, 1976 | 8,000 | 4.750 |

Each of petitioners was informed by Mr. Spencer and Mr. Lebkuecher that the general partners of Levon Records, Mr. Robert G. Stobaugh and Mr. Jessie Prater, had, as of December 31, 1976, no prior experience in the production or distribution of phonograph records.

On October 27, 1976, Levon Records was formed with Mr. Stobaugh and Mr. Prater as general partners. The Levon Records limited partnership agreement was filed with the Department of State, Tallahassee, Fla., on November 19, 1976.[4]

Under the partnership agreement, Mr. Stobaugh and Mr. Prater had the exclusive right to manage the business affairs of Levon Records and were to use such time as they deemed necessary for the efficient management of such affairs. They had full power to deal with the partnership's assets, to lease assets, to borrow money, to enter into contracts, to engage employees or agents, to deal with the debts owed to Levon Records, and to carry on any other activity necessary to accomplish the purposes of the partnership. Finally, the

---

[3]In order to be a limited partner, each petitioner had to have a net worth of at least $100,000 (exclusive of home, home furnishings, and automobiles) or 5 times the invested amount, whichever was greater, and some portion of each petitioner's estimated taxable income for 1976 had to be taxable at a rate of not less than 50 percent for Federal income tax purposes. Petitioners were informed that they would have a limited ability to transfer or sell their partnership interests and that the economic risk of becoming a limited partner was high.

[4]An amendment to this agreement was filed with the Department of State, Tallahassee, Fla., on Dec. 30, 1976, which added five additional limited partners to the partnership, bringing the total number of limited partners in Levon Records to 16.

general partners were required to maintain full and accurate books and records and furnish annual reports to the limited partners with respect to income tax matters.

## *The Acquisition and Leaseback*

The bare bones of the purported acquisition and leaseback can be summarized as follows: Chiodo-Scott Productions Co., Inc. (hereinafter Chiodo-Scott), a corporation formed by David Chiodo and Michelle Scott, was to sell four master recordings to Common Sense Group, Inc. (hereinafter Common Sense), a corporation owned by Mr. Spencer and Mr. Lebkuecher, for cash and a nonrecourse promissory note. At the same time, Common Sense was to sell the master recordings to Levon Records for cash and a nonrecourse note. Simultaneously, Levon Records was to lease the recordings back to another corporation whose principal officers were Mr. Chiodo and Ms. Scott, SRS International Recording Corp. (hereinafter SRS), which was to promote and distribute the master recordings.

### *1. Acquisition by Common Sense*

Common Sense was a corporation formed in 1974 or 1975, although it appears that it had not conducted any business prior to its involvement with Levon Records. Mr. Spencer, a 50-percent owner of the corporation, described himself at trial as an investment adviser. In early 1976, Mr. Spencer and Mr. Lebkuecher met with an attorney for the purpose of exploring investment possibilities in various fields of entertainment. Through the attorney, they were introduced to David Chiodo and Michelle Scott, who owned a recording studio located in Ft. Lauderdale. Messrs. Spencer and Lebkuecher inspected the premises and were satisfied, although it appears that neither had any experience in the music industry. Thereafter, they began negotiations with Mr. Chiodo and Ms. Scott for the intended acquisition of the rights to four record albums.

By letter dated June 21, 1976, and addressed to Michelle Scott of SRS, Mr. Spencer and Mr. Lebkuecher summarized the negotiations conducted on June 18 and agreed to accept her offer to sell the rights to four record albums, namely, "Sensitive Cat" by Rupert Cobbett, "Glory Road" by the Master's Men, "The Song Is Love" by Sharon Klee, and "Come

on Sign" by Joe E. Neubauer. The letter stated that the terms for payment were "cash in the amount of $21,250 for each album, and a non-recourse note in the amount of $63,750."

On September 10, 1976, David Chiodo, as producer for Chiodo-Scott,[5] sent a letter to Messrs. Spencer and Lebkuecher which purported to appraise the value, based upon his knowledge of similar products, of a package of four recordings entitled "Sensitive Cat" (jazz), "Glory Road" (gospel), "Come on Sign" (pop), and "Christmastime Stories" (children).[6] Mr. Chiodo represented that the combined sales of these records should easily exceed 1,600,000 units over a 3-year period.[7] His valuation assumed normal retail sales at a "conservative" $5.98 per album and specifically did not take into account "special promotion, discount or premium sales." Thus, Mr. Chiodo estimated that the fair market value of the record package was "at least" $9,568,000.

On November 30, 1976, the purported sale of the master recordings of the four records by Chiodo-Scott to Common Sense was consummated. Chiodo-Scott received $85,000 in cash for the package and Common Sense executed an $840,000 nonrecourse promissory note secured by the master recordings and payable from 60 percent of the proceeds of Common Sense, net of distribution costs and expenses.[8] Interest was to accrue on the note at the rate of 6 percent per annum and was due on or before December 31, 1988.[9]

## 2. *Acquisition by Levon Records*

Pursuant to the Levon Records partnership agreement, the partnership was to purchase from Common Sense the copyrights and master phonograph recordings and "the rights

---

[5]Chiodo-Scott was Mr. Chiodo's and Ms. Scott's production company. It was responsible for the actual production of master tapes. This included assembling musicians, scheduling recording sessions, locating arrangers and producers, and gathering material from publishing companies, among other duties.

[6]The substitution of "Christmastime Stories" for "The Song Is Love" is not explained.

[7]This letter, along with another short letter in which a Mr. Joseph Stanzione predicted combined sales of 2.5 million records over a 2- to 3-year period, was included in the Confidential Descriptive Memorandum supplied to the limited partners of Levon Records.

[8]The $85,000 was the first large amount of money ever received by Chiodo-Scott. Much of this was used to upgrade the Chiodo-Scott studio and to produce other master recordings.

[9]It cannot be ascertained from the evidence whether the note was ever filed or recorded in order to protect the rights of the secured parties.

therein" of the four records. Accordingly, Levon Records entered into an acquisition agreement dated November 30, 1976, wherein it agreed to purchase the right to manufacture, distribute, and sell the copyright of the records and master tape recordings of the following records (hereinafter collectively referred to as the master recordings):

| Title of record | Artist |
|---|---|
| Sensitive Cat | Rupert Cobbett |
| Glory Road | Master's Men |
| Love Got in My Way | Joe E. Neubauer |
| Christmastime Stories | Marie White |

The total purchase price for the master recordings was set at $1,076,500, $136,500 of which was payable in cash, and $940,000 of which was payable by execution of a nonrecourse promissory note secured by a first security interest in the master recordings. Interest was to be accrued on the unpaid balance of the note at the rate of 6 percent per year. Sixty percent of the proceeds from the sale of the records, net of distribution costs and expenses, received by Levon Records was to be paid to Common Sense as interest and principal on the note until the note was fully paid. At the time of closing, Common Sense was to deliver to Levon Records a bill of sale to the master recordings, a recording studio or pressing plant access letter giving the partnership access to the master recordings and materials of the records, and a duly executed assignment of copyrights to the master recordings. At the same time, Levon Records was to deliver to Common Sense $136,500 in cash, a nonrecourse note for $940,000, and a mortgage of copyright and security agreement to the master recordings.

In actuality, Levon Records did not pay Common Sense $136,500 as stipulated in the acquisition agreement, but instead paid $85,000 directly to Chiodo-Scott on November 15, 1976, and paid Mr. Spencer and Mr. Lebkuecher $51,500 on December 13, 1976. There is no evidence of record that Common Sense delivered to Levon Records a bill of sale, recording studio or pressing plant access letter, or an executed assignment of copyrights. Neither is there any proof that

Levon Records delivered to Common Sense a nonrecourse note or a mortgage of copyright and a security agreement.[10]

### 3. *The Leaseback by Levon Records*

On the same day that Levon Records allegedly acquired the master recordings, it leased them back to Mr. Chiodo and Ms. Scott as the principal officers of SRS. SRS was a rental recording facility, not a record distribution company. It was one of a group of corporations owned and controlled by Mr. Chiodo and Ms. Scott for the purpose of recording, producing, and distributing record albums. INDI Distribution Corp. (hereinafter INDI) was the distribution arm of this group of corporations.

The terms of the leaseback arrangement are embodied in an agreement, also entered into on November 30, 1976, and dated November 5, 1976, known as the record distribution agreement. This agreement granted SRS full rights to the distribution of the phonograph records produced from the master recordings for a period of 12 years. Under the terms of the distribution agreement, Levon Records could not cancel the agreement during the first 2 years of the 12-year term (from November 30, 1976, through November 30, 1978). After November 30, 1978, Levon Records could cancel the agreement only if SRS failed to sell at least 1,000 copies of each of the four master recordings during each 12-month period, or if SRS did not use its best efforts in distributing the records in conformance with generally accepted distribution practices in the recording industry.[11] SRS agreed as part of the record distribution agreement to manufacture 3,000 copies of each of the recordings for distribution. The agreement also gave SRS the right to authorize sub-licensees to distribute the recordings.

Under the distribution agreement, SRS warranted that the wholesale or distributor price for retail sales would be $1.45 per album. SRS agreed to pay Levon Records as royalties the

---

[10]Again, it does not appear that any security agreements encumbering the master recordings were ever filed in order to protect Common Sense's priority position.

[11]The distribution agreement could also be terminated by Levon Records if SRS was adjudicated bankrupt or was unable to pay its debts as they matured.

following percentages of the moneys received from the sale of the records:

Sensitive Cat ....................................61%
Glory Road .....................................42
Come on Sign .................................52
   (Love Got in My Way)
Christmastime Stories ........................52

SRS was required to render a statement of earned and accrued royalties during the preceding calendar year on or before March 1 of each year. It was also obligated to pay Levon Records monthly all moneys collected by it on the sale of records in accordance with the percentages set forth in the agreement. SRS was also to provide Levon Records with a quarterly annual report on the sales efforts being undertaken, the reception of the records in the marketplace, approximate sales figures, the exposure of the records, and any other pertinent information with respect to SRS's activities in promoting the sales of the records.

The relationship between Levon Records and SRS was originated and structured by Mr. Spencer and Mr. Lebkuecher. Both the original and amended confidential descriptive memoranda of the Levon Records partnership informed the limited partners that there was no assurance that the distributor would fulfill its obligations under the distribution agreement.

*Activities of Levon Records*

During 1976 and 1977, Levon Records listed its address as 2071 Main Street, Sarasota, Fla. It did not own or rent any office or business space at that location and had no telephone listing in the Sarasota city directory during 1976 or 1977. The partnership did not own any equipment during these years.[12]

Levon Records did not maintain a formal set of books and records for 1976 and 1977.[13] The general partners did not have

---

[12]Mr. Spencer and Mr. Lebkuecher provided Levon Records with assistance in its administrative operations, such as accounting and tax preparation. During 1977 and 1978, they were paid a total of $3,600 for their services.

[13]The partnership's books and records consisted of several accountants' workpapers, bank statements, and canceled checks.

control over the partnership books and records or over the partnership savings and checking accounts.[14] The only deposits made into these accounts between November 11, 1976, and November 28, 1980, were amounts received from the limited partners totaling $160,000, all of which was deposited into the savings account. As funds were needed by Levon Records, they were transferred from the savings to the checking account.

In entering into the master recording transaction, neither the general nor the limited partners sought the advice of an appraiser with respect to the master recordings independent of the appraisals supplied by Common Sense. The general partners never had physical possession of the master recordings.

In stark contrast to the rights, powers, and duties conferred on the general partners by the limited partnership agreement, the general partners spent little or no time and effort on the affairs of Levon Records. They were not aware of their legal responsibilities as general partners under State law. They were unfamiliar with the entity which they supposedly had selected to distribute Levon Records' records. Since they never had control over the partnership books and records or bank accounts, their familiarity with such records and accounts was wholly nonexistent. They were unaware of the funds that were available to Levon Records and of how these funds were being spent. They did not examine the records allegedly acquired by the partnership until 1977 and did not meet the personnel of, or view the premises of, SRS until October 1977.

The general partners of Levon Records knew nothing about the record business. They did not attempt to compensate for this lack of knowledge by consulting with industry experts or otherwise researching the feasibility of entry into the music industry in 1976. They did not know how the master recordings were produced or who produced them. Despite the fact that they never received any copyright registrations on the master recordings, the general partners never inquired into the ownership rights to such recordings.[15] In point of fact, the

---

[14] Ruth M. Burroughs, an employee of Mr. Spencer and Mr. Lebkuecher, was the sole person in control of the partnership's bank accounts.

[15] Levon Records was not presented with any artist recording contracts involving the artists whose performances were the subject of the master recordings. The only available

only copyright certificates presented at trial were not registered in the name of Levon Records and were not filed until June 20, 1977. These certificates, claiming copyrights to "Sensitive Cat" and "Christmastime Stories," were filed in the name of Chiodo-Scott.

Levon Records did not itself engage in any manufacturing or sales of tapes or phonograph records in 1976. It earned no income from the master recordings during 1976 and 1977, or, apparently, at any time thereafter.

*Activities of SRS*

In early 1976, SRS did not have sufficient capital to produce and market a record using its own resources. Mr. Chiodo of SRS heard about the availability of "tax shelter money" that would enable him to finance his fledgling operation. Although no records were introduced with respect to the costs incurred to produce the four recordings, it appears that at least some of the money received by SRS from Levon Records was used for purposes not directly associated with the production and marketing of such recordings. For instance, some of the funds were used to build SRS's catalogue of artists and to produce albums not covered by the acquisition and leaseback transaction. In violation of the terms of the record distribution agreement, which required SRS to manufacture 3,000 copies of each of the recordings for distribution, SRS pressed only 1,000 copies of each master recording.[16] These records were mailed

---

artist recording contract involving such artists was between Chiodo-Scott and the artists and gives Levon Records no rights with respect to the future performance of the artist.

Levon obtained none of the following information or documents from Common Sense or any other source pertaining to the master recordings: (a) records of royalty payments to unions; (b) records of payments to publishers for use of songs; (c) clearances from artists for the use of the music; and (d) licenses issued for the material recorded.

[16]The average cost to SRS of pressing and packaging each record was approximately $1.10. This did not include any artist or publisher royalties, union payments, or mailing expenses.

The record distribution agreement provided that SRS was to hold Levon Records safe and harmless with respect to any claims made by third parties against Levon Records in connection with the cost of manufacturing records, the cost of advertising and promotion, artist and music publisher royalties, payments required to be made to producers or labels, and all other costs incurred directly or indirectly by SRS. In 1978, Mr. Spencer and Mr. Lebkuecher drafted an exchange of letters to be executed by Levon Records and SRS to amend the record distribution agreement. The amendment provided that Levon Records would be liable for 50 percent of SRS's distribution costs of the master recordings not to exceed $10,000 beginning as of March 1, 1978, and that, if called upon to provide funds to SRS, Levon Records' share of the revenues from the sale of the recordings would be

to radio stations that corresponded to the type of market at which the record was aimed. At the same time, a representative sampling of the product went to distributors across the country. As stated, SRS failed to press any copies of the master recordings bearing a copyright in the name of Levon Records as required by the distribution agreement.

The record distribution agreement provided that SRS was to advertise and distribute records pressed from the master recordings through appropriate mail-order and retail outlets. SRS did not have any written contracts with record retail outlets to effectuate this agreement.

Prior to 1976, Mr. Chiodo had no distribution contacts and had no experience in the distribution of records.[17] In addition, the three employees mentioned by Mr. Chiodo as being responsible for promotion had no appreciable experience in this area.

The promotional and distributional efforts with respect to the master recordings in issue were done in part by SRS's affiliate, INDI. The only complete document which reflected these efforts was a journal entitled "INDI Record Distribution Mail Log." The journal indicates that promotional efforts commenced on February 5, 1977, with the mailing of records to selected radio stations and continued sporatically thereafter. The SRS/INDI daily report file contained entries beginning on January 25, 1977, and continuing through January 31, 1977, with the entries falling off in ensuing months to 1 or 2 per month. The entries are divided according to information received by mail (mostly postcards) and by telephone.

At trial, Mr. Chiodo's testimony showed that he was not readily familiar with the radio stations listed in the postcard files and the markets served by those stations. Most of the stations to which the records were sent were insignificant and could not be expected to have substantial impact on the sales of the records promoted. Most of the interest shown in the master recordings came from insignificant college radio sta-

---

increased 10 percent. However, this amendment did not result in any change in conduct since there continued to be no record sales and Levon Records was not called upon to make any payments.

[17]SRS, through INDI, developed just one limited distribution contact after 1976.

tions. By November 1977, the promotional and distributional efforts of SRS had slowed to a stop.

Neither SRS nor its distribution company INDI ever was able to obtain any sales of records pressed from the master recordings.[18] Consequently, Levon Records received no royalties from SRS. Moreover, the partnership received no notices from SRS in 1976 and 1977 as required by the record distribution agreement.[19] SRS was dissolved as a corporate entity on December 5, 1979, following a bankruptcy proceeding.

### The Fair Market Value of the Master Recordings

Accompanying the partnership memorandum supplied by Mr. Spencer and Mr. Lebkuecher to potential limited partners of Levon Records were two letters of appraisal. One of the letters, drafted by Mr. Joseph Stanzione, predicted without elaboration that the four records "should have a combined sales volume of more than two and one-half million copies over a two to three year period." A second appraisal, furnished by Mr. David Chiodo, predicted sales during a 3-year period in excess of 1.6 million records and estimated the fair market value of the four master recordings to be at least $9,568,000. Mr. Chiodo was apparently somewhat less sanguine in his expectations during negotiations with Common Sense, for such negotiations produced an acquisition agreement which required Common Sense to pay $85,000 in cash and $840,000 in the form of a nonrecourse note payable only out of proceeds. Levon Records, in turn, paid $136,500 in cash and $940,000 in the form of a nonrecourse note payable only out of proceeds.

The predictions contained in the two cursory letters of appraisal were fantastical. During the 3-year period covered by the appraisals, sales volume held steadily at zero. The master recordings did not generate any revenues to Levon Records.

---

[18]Mr. Chiodo did not know whether any of the records he had produced ever had achieved commercial success. In fact, it appears that he was not even certain whether an LP or single ever resulted from his past work. He stated that he never followed his work beyond the recording stage. His involvement ended when he received his check.

[19]A letter dated July 18, 1977, from SRS did not contain any sales figures or specific information on promotional activities.

The "Joe E." album "Love Got in My Way" is a recording of unknown material by an unknown artist. The arrangements are badly conceived. The background singers are sometimes out of tune and the sparse string accompaniment occasionally is lost to over-accentuated bass. The overall quality of the musicianship is at best average. Additionally, the technical quality of the recording is quite poor and below current industry standards. The vocals of the featured artist are distorted and have a hollow sound, and the echo is excessive. The instrumentation and the background singers are not properly balanced, either because of improper microphone placement or mixing procedures. Many of the songs are faded too abruptly. The record jacket is poorly designed and below industry standards. The album package fails to describe the type of music performed by the artist or the background of the artist. Given the fact that Joe E. is an unknown artist, this is a serious omission. The album cover carries the catalog number DM764, while the album label carries the catalog number DM763. This discrepancy is not explained. Taking all of these factors into consideration, the fair market value of this album as a recording to be sold through standard retail outlets is de minimis for purposes of this case. Because of its poor quality, it could not be successfully promoted.[20]

The Master's Men album "Glory Road" is a recording of well-known gospel selections by an unknown group. Although the quality of the vocals on the album is adequate for church work, it is not acceptable for commercial production. The arrangements and harmonies are not of professional caliber, and the solo singers are below standard. The group is not unique and has no special qualities that would set it apart from any of the numerous gospel groups performing in the United States today. In this category of music, it is important to capture the vocal harmony of the group. This has not been accomplished. Due to poor microphone placement or mixing technique, the overall vocal quality is very shallow. The instrumentation is sparse and at times not balanced with the

---

[20]This album is the type of album that an artist would record and pay for himself so that he could sell the album at his various performing engagements. The reason that the artist pays to record this type of product is because no record company would be willing to finance such a recording due to the absence of market potential.

vocalists. There are surface noises on the recording and the recorded levels vary by selection. Technically this album would have to be classified as substandard. Because of the poor technical quality of the recording, there is little chance that radio station exposure would be forthcoming. The album jacket, which appears to be an original art work from a New Jersey church, meets commercial standards for a religious album. However, neither the album cover nor the label carries a copyright protection notice. This indicates a disregard for proper business procedures currently practiced within the music industry. The album is on the Master's Men label, giving every indication that it is owned by that group.[21] Taking all these factors into consideration, the fair market value of the Master's Men album is de minimis. The only possible sales potential would be by the group at personal appearances. Such sales would be minimal.

The Rupert Cobbett recording "Sensitive Cat" is an album of unknown material performed by an unknown artist. The album cover indicates that the recording is in the "progressive" jazz style, but the actual selections are more in the "lounge" jazz style. The technical quality of the album can only be described as fair. There are surface noises and abrupt fades, indicating that substandard editing and engineering techniques were employed. The recording is badly mixed and the disc quality is poor. These defects would be unacceptable to an astute jazz aficionado. In the case of an unknown jazz artist performing unknown material, the record jacket is extremely important. In such case, it is essential that the musicians or solo artists be identified. Additional informational notes are also helpful. No such information appears on "Sensitive Cat." The album jacket also fails to divulge where and when the album was recorded. Finally, the jacket carries the catalog number DM763, while the label carries the number DM764. Taking all these factors into account, the fair market value of the Rupert Cobbett album is de minimis. Although the performer may be able to sell a limited number of these albums at personal appearances, such sales would not be substantial.

---

[21] Again, this is the type of album that a group would have recorded solely for sale at their various personal appearances.

The "Christmastime Stories" album, written by Marie White as told by "Santa Claus," is a narrative production of unknown Christmas stories by an unknown and unidentified artist. The material is not particularly compelling. The technical quality of the album is abysmal. There are surface noises throughout the record and the editing leaves much to be desired. The sound effects are poorly coordinated and the electrically enhanced voices are poorly synchronized. The mix varies throughout the recording with each story having different levels of sound. Christmas albums are by nature aimed at a very limited audience due to their seasonal demand. They do not normally receive much radio air play. The sales potential of children's Christmas albums is even more restricted. The buyer of such albums prefers known material by a known performer. A format of the type attempted on "Christmastime Stories" needs quality production and subject matter, but commercial success depends most importantly upon the presence of a name performer. This album has none of these attributes. Taking all these factors into account, "Christmastime Stories" has no market potential. Its fair market value is de minimis.

On their returns for the years in issue, petitioners claimed losses, additional first-year depreciation, and investment credit derived from their respective interests in Levon Records as follows:

| Petitioner | Investment credit | 1976 loss | First year depreciation | 1977 loss | Total losses |
|---|---|---|---|---|---|
| Flowers[22] | $4,474 | $3,531 | $83 | $11,402 | $15,106 |
| Williams | 5,113 | 4,051 | 95 | 13,032 | 17,178 |
| Crist | --- | --- | --- | 8,145 | 8,145 |
| McCallie | 5,113 | 4,034 | 95 | 13,032 | 17,161 |
| Peck | 5,113 | 4,051 | 95 | 13,032 | 17,161 |
| | 19,813 | | | | 74,751 |

In his notices of deficiency to petitioners dated February 28, 1980, respondent disallowed these credits and loss deductions in their entirety.

---

[22]On June 12, 1978, petitioners George T. and Donna Flowers filed an application for tentative refund with the Internal Revenue Service Center, Chamblee, Ga., in which they claimed a carryback from 1977 to 1974 of unused investment credit and new jobs credit in the amount of $1,078.

OPINION

At issue in this case are deductions and credits claimed by petitioners as a result of their respective interests as limited partners in Levon Records. Respondent purports to disallow these deductions and credits on a variety of grounds. We choose to begin by addressing the issue of whether the partnership activities were engaged in for profit.

A large portion of the partnership deductions for the years 1976 and 1977 consisted of deductions for depreciation of the master recordings. Section 167(a), I.R.C. 1954, confers as a depreciation deduction a reasonable allowance for the exhaustion of (1) property used in a trade or business, or (2) property held for the production of income. The carrying on of a trade or business is also a prerequisite to deductibility under section 162. See sec. 162(a). Thus, absent a trade or business, the partnership is not entitled to deductions pursuant to either section 162(a) or section 167(a).[23] A similar analysis is applicable with respect to the investment tax credit.[24]

A partnership activity does not constitute a trade or business unless the partnership engages in the activity with the predominant purpose and intention of making a profit. *Siegel v. Commissioner*, 78 T.C. 659, 698 (1982). See also *Brannen v. Commissioner*, 78 T.C. 471, 505 (1982); *Engdahl v. Commissioner*, 72 T.C. 659, 666 (1979). Although it is not necessary that the partnership's profit-making expectations be reasonable, its profit objective must be in good faith. Sec. 1.183–2(a), Income Tax Regs.; *Allen v. Commissioner*, 72 T.C. 28, 33 (1979). The determination of whether the requisite intention exists is one of fact to be resolved on the basis of all

---

[23]Although expenses incurred for the production of income as described in sec. 212 cannot give rise to partnership deductions (sec. 703(a)(2)(E)), they can be taken into account separately by each partner pursuant to the authority of sec. 1.702–1(a)(8)(i), Income Tax Regs. In the instant case, the deductions were taken by the partnership as expenses incurred in a trade or business. Neither Levon Records nor the individual petitioners claimed deductions under sec. 212(1) or sec. 212(2) on their returns, and no argument has been made at trial or on brief that the deductions claimed are anything other than trade or business expenses.

[24]The credit is only available where the subject property is depreciable and has a useful life of 3 years or more. Sec. 48(a)(1). Thus, if the property cannot be depreciated because it was not used in a trade or business (or was not held for the production of income, see note 23), it cannot give rise to investment tax credit. *Pike v. Commissioner*, 78 T.C. 822, 841–842 (1982).

the facts and circumstances. *Dunn v. Commissioner*, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980).[25] The burden of proof is upon petitioners (Rule 142(a), Tax Court Rules of Practice and Procedure; *Golanty v. Commissioner*, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981)), with greater weight to be placed upon objective facts than upon mere statements of intent. Sec. 1.183–2(a), Income Tax Regs.; *Churchman v. Commissioner*, 68 T.C. 696, 701 (1977).

The issue of whether the activities of Levon Records were engaged in with the predominant purpose and intention of making a profit must be determined at the partnership level. *Brannen v. Commissioner, supra* at 505. This does not mean, however, that our inquiry is confined solely to the activities of the partnership, for those parties possessing resources sufficient to acquire and exploit investment property are not always blessed with corresponding expertise. In such case, a partnership can rely upon the expertise of third parties by contractually assigning most of the normal duties and responsibilities associated with the income-generating operations to such parties. The scope of the relevant inquiry therefore expands to encompass the entirety of such multilayered transactions. See *Siegel v. Commissioner, supra* at 700–702; *Brannen v. Commissioner, supra* at 509–511.[26] However, the profit motive issue must still be assessed from the perspective of the partnership. Thus, where the partnership is virtually passive in its operations, the prudence it exercises in acquiring property and in assigning duties to third parties, and the care with which it oversees the performance of such duties are of heightened importance.

---

[25]Some of the relevant factors to be considered in determining whether an activity is engaged in for profit are (1) the manner in which the taxpayer carried on the activities; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Sec. 1.183–2(b), Income Tax Regs.

[26]See also sec. 1.183–2(b)(2), Income Tax Regs., which lists as a factor to be considered in determining profit motive the expertise of the taxpayer *or his advisers.*

*The Acquisition and Leaseback*

There is little evidence that the partnership's decision to acquire the master recordings was based upon the types of considerations that normally would be expected to influence a sincere investor. The facts are undisputed that the general partners of Levon Records knew nothing about the record business and that they made no attempt to fill this void by consulting with industry experts or by otherwise researching the feasibility of entry into the music business in 1976. No appraisal of the master recordings was obtained by them independent of the fanciful statements supplied by Mr. Chiodo and Mr. Stanzione. The sales prognostications contained in the letters of appraisal rendered by these individuals and accompanying the partnership memorandum are not probative of a profit objective since we believe that neither the promoters nor the general partners gave any real credit to these documents. It does not appear that either of the two appraisals was a product of extensive analysis. Moreover, we believe that none of the parties responsible for the purchase of the master recordings regarded Mr. Chiodo's statements as anything other than pure puffery, since, at the time he made them, he was the owner of the property being appraised. Mr. Stanzione's appraisal is unworthy of reliance since no credentials establishing his expertise or otherwise identifying him were provided and no basis was given for the unrealistic conclusions he reached. The eventual sales price exacted by Mr. Chiodo for the four master recordings indicates that his appraisal was not made with any conviction. On September 10, 1976, he represented that the fair market value of the four records was at least $9,568,000. On November 30, 1976, he sold the records for $85,000 in cash and an $840,000 nonrecourse note. Nothing occurred between these two dates to account for the dramatic decline in value. In a transaction entered into for profit, we submit that this huge unexplained discrepancy should have raised an eyebrow or two. The fact that it did not supports, at the very least, our conclusion that the letters of appraisal had no substance in the eyes of either the general partners of Levon Records or the promoters.

Given this, it is apparent that the general partners had no basis upon which to make an informed investment decision with respect to the master recordings. Instead, they placed

absolute reliance upon the judgment of Messrs. Spencer and Lebkuecher by passively accepting the terms of the acquisition and leaseback arrangement as drafted by those individuals. However, such reliance surely was not inspired by the promoters' expertise since neither had any experience in the record industry. The investigations by Mr. Spencer and Mr. Lebkuecher were hardly thorough. They were introduced to David Chiodo and Michelle Scott through an attorney whom they had consulted for the purpose of exploring various fields of entertainment. Subsequently, they inspected the business premises of Chiodo-Scott. Given their unfamiliarity with the record business, their visit at most could have only served to satisfy them that such premises existed and that people worked there. These facts do not adequately explain the promoters' ready willingness to acquire and resell the master recording package. Mr. Spencer and Mr. Lebkuecher either simply failed to do their homework or were attracted by something other than the pure business aspects of the acquisition and leaseback transaction.

In the end, ultimate trust was placed in the hands of Mr. Chiodo and Ms. Scott.[27] None of the intervening parties were qualified to appraise the business or the master recordings, and no effort was undertaken to obtain independent appraisal. The general partners cannot hide behind the structure of the transaction to insulate themselves from the fact that there was no source for optimism beyond the self-serving assurances of Mr. Chiodo and Ms. Scott.

There is no evidence that the price established by the parties for the double acquisition of the master recordings resulted from any meaningful negotiations. As far as can be ascertained, Mr. Chiodo readily accepted what was offered. He testified that he considered the $85,000 in cash he received to be "tax shelter money." He also stated that this cash, which was the first large amount of money ever received by Chiodo-Scott, was used in part to further interests not associated with

---

[27]The favorable representations made to Mr. Spencer and Mr. Lebkuecher by the attorney with whom they consulted do not count for much. He was not called to testify and therefore, among other things, his general expertise and specific familiarity with Chiodo-Scott were not established.

the master recordings. In discussing the transaction, Mr. Chiodo made no mention of the nonrecourse note.[28]

If Mr. Chiodo had really believed that the master recordings had a fair market value of $925,000 (i.e., $85,000 in cash plus the $840,000 nonrecourse note received from Common Sense), we do not believe that he would even have considered entering into the sale-leaseback arrangement. Instead, he simply would have retained the recordings and exploited them himself. After the simultaneous sale and leaseback, Mr. Chiodo remained in possession of the four master recordings and had the right to promote and distribute them. In this respect, his situation was unchanged. However, in return for the $85,000 downpayment, Mr. Chiodo surrendered the right to a minimum of 33 percent of the total revenues from the sale of records pressed from the master recordings.[29] He also obligated himself to promote and distribute such records at the risk of forfeiting another 48 percent of such revenues.[30] Such a lopsided deal might be understandable if Mr. Chiodo had been in dire need of cash to finance his promotional and distributional efforts and was unable to obtain it from other sources. However, since the $85,000 was not used for such purposes, this explanation is not available.

Under the distribution agreement entered into by SRS and Levon Records, SRS warranted that the wholesale or distributor price for retail sales would be $1.45 per album. SRS agreed to pay Levon Records as royalties an average of 51.75 percent of the moneys received from the sale of the records. In turn,

---

[28]If the transaction was entered into primarily to generate tax benefits, the interests of the buying and selling parties would not necessarily be adverse. The buyer would want to purchase the property for a price that is greatly inflated by means of a nonrecourse note. This would give him large up-front deductions at little out-of-pocket cost. Of course, the seller would have no reason to object to such artificial inflation of the purchase price. At the same time, the acquiring party would also wish to make a cash downpayment in order to give the transaction an appearance of economic substance. In such case, as long as the cash payment equaled or exceeded the value of the property sold but was not so high that it reduced the out-of-pocket cost to tax benefit ratio to an unacceptably low level, the parties would have no trouble reaching an agreement.

[29]$1 - ((1 - 0.5175) + (0.5175)(0.6)(0.6)) = 0.3312$. The figure 0.5175 represents the average royalty SRS would have to pay Levon Records under the distribution agreement. The 0.3312 figure represents the amount which would be received by Levon Records and Common Sense until the note was paid off. After that time, Mr. Chiodo would receive even less since he would no longer be receiving proceeds under the sales agreement.

[30]$1 - 0.5175 = 0.4825$.

Levon Records was obligated to pay Common Sense 60 percent of the amounts received from SRS, net of distribution costs and expenses, until such time as the nonrecourse note and any interest accrued thereon was satisfied. Accordingly, since Levon Records could only retain 40 percent of the royalties received from SRS, it would take sales revenues in the approximate amount of $772,947 in order for the partnership to recover the cash it expended in purchasing the master recordings.[31] Thus, assuming the records were sold for $1.45 as stipulated in the distribution agreement, SRS would have to sell approximately 533,067 records in order for the partnership to recover its cash outlay.[32] Even so, the partnership still would not show a net profit since it would owe a substantial amount of principal and interest on the nonrecourse note.[33]

There is very little in the partnership memorandum to inspire a belief that sales would ever be substantial. The memorandum warned that the record business is highly speculative and involves a substantial degree of risk. It stated that there was no assurance that the distributor would fulfill his obligation under the distribution agreement, that the general partners had no experience in the production and distribution of records, and that no one involved with the scheme assumed any responsibility for the tax consequences to the limited partners of the transaction. Attached to the memorandum was a detailed explanation of the tax benefits that would accrue to the limited partners if the tax treatment were not successfully challenged by respondent. The memorandum admonished that there was a risk that respondent would attempt to disallow a substantial portion of the deductions enjoyed by the limited partners. As a whole, the partnership memorandum accentuates the beneficial tax consequences, and the concurrent risks, while placing relatively little emphasis upon any potential return that might be expected from record sales.

Of the total $1,076,500 paid by Levon Records for the four master recordings, $940,000 was in the form of a nonrecourse

---

[31]$772,947 (0.5175) (0.4) equals $160,000.

[32]If the albums were sold for $2.98, it would take sales of approximately 259,378 albums in order for the partnership to recover its cash.

[33]By contrast, the actual sales from the four master recordings were zero.

note. We found as a fact that the fair market value of the four master recordings was de minimis at the time of their acquisition by Levon Records.[34] Thus, the principal amount of the nonrecourse note greatly exceeded the fair market value of the property acquired with the note. If the principal amount of the nonrecourse note unreasonably exceeds the value of the property acquired, the note does not constitute "genuine indebtedness" and therefore is not included in the purchaser's basis of the property. *Odend'hal v. Commissioner*, 80 T.C. 588, 604 (1983). However, a purchase price that is grossly inflated by means of nonrecourse indebtedness also raises serious questions about the motives of the acquiring parties. Where there is a small cash downpayment and the remainder of the acquisition price is satisfied with nonrecourse indebtedness that is not supported by the fair market value of the property acquired, the possibility exists that the acquisition was undertaken to generate tax benefits. Thus, where other factors are present, the existence of a highly inflated nonrecourse note can contribute to the finding that the activity with respect to which the property was acquired was not entered into for profit. It is the presence of the nonrecourse indebtedness that creates the potential for shenanigans, and where it is found that a transaction lacked economic motivation but rather was undertaken primarily to reduce taxes by generating deductions and credits attributable to an inflated basis derived predominantly from nonrecourse indebtedness, such indebtedness is not merely self-destructive, but can taint the entire transaction.[35]

---

[34] Our determination with respect to the fair market value does not *necessarily* reflect upon the quality of all of the artists involved. Our valuation was largely based upon the unrefuted testimony of respondent's expert witnesses, who found that the master recordings were poorly conceived, poorly mixed, poorly recorded, poorly packaged, and generally uninspired. In *Brannen v. Commissioner*, 78 T.C. 471, 490 (1982), we found that a movie starring Lee Van Cleef had relatively minimal fair market value based in part upon the fact that it was poorly produced. Mr. Van Cleef's acting talents were not assailed. Of course, in the instant case, the performers all were unknown, a fact which is not helpful to petitioners' cause. But even if they had achieved some notoriety, such status does not necessarily guarantee that the activity was engaged in for profit, as *Brannen v. Commissioner, supra,* pointed out.

[35] In a multi-party transaction such as the one present herein, deductions and credits can be denied if it is found that the transaction was not a genuine multi-party transaction. See *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1236 (1981). Because we have

## Conduct of the Parties

Under the Levon Records agreement, the general partners were given the exclusive right and full power to manage the business affairs of the partnership. Among other duties, they were required to maintain full and accurate books and records. In contrast to these rights, powers, and duties, the general partners spent little or no time and effort on the affairs of Levon Records. They had no knowledge of their responsibilities as general partners under State law and were ignorant of virtually all aspects of the master recording transaction that the partnership they were supposed to be managing had entered. More specifically, the general partners never received any copyright registrations with respect to the master recordings and failed to inquire into the ownership rights to such recordings. Most importantly, Levon Records, through its general partners or any other parties acting on its behalf,[36] did not demand or encourage SRS to live up to its obligations under the distribution agreement.[37] In sum, the general partners took absolutely no steps to protect or further the interests of Levon Records. SRS was on its own.

Under the distribution agreement, SRS was obligated initially to press 3,000 copies of each master recording and a minimum of 1,000 per year thereafter (recall that pursuant to the terms of the distribution agreement, it would take record sales of approximately 533,067 records to allow Levon Records merely to recover its cash outlay). It was to use its best efforts in promoting and distributing the records it pressed.

In 1976, SRS did not possess sufficient capital to produce and market a record using its own resources. Although Mr. Chiodo, through Chiodo-Scott, received $85,000 cash from the sale of the master recordings to Common Sense, it does not appear that this money was transferred to SRS to finance the

---

chosen to address the issue of profit motive, we need not make this determination. However, were we faced with this issue, petitioners would have a difficult row to hoe.

[36]Although the acquisition and leaseback transaction was orchestrated by Messrs. Spencer and Lebkuecher, it does not appear that these individuals stepped in and assumed the duties that the general partners failed to perform.

[37]For instance, when SRS pressed only 1,000 copies of each master recording instead of the required 3,000 copies, no action was taken by the limited partnership. Likewise, it does not appear that the partnership was overly concerned by SRS's failure to send notices in 1976 and 1977 that satisfied the specific requirements of the distribution agreement.

necessary promotional and distributional efforts with respect to the master recordings.

As has been pointed out, SRS did not fulfill its obligation to press 3,000 records from each master recording. The evidence is persuasive that the promotional and distributional efforts of SRS and INDI were minimal and ineffective. Of the records pressed, a number were sent to various radio stations in early 1977. Many of the stations to which the records were mailed were not significant and were not the type that could be expected to generate sales. By November 1977, the promotional and distributional efforts of SRS had ceased. These meager, short-lived efforts predictably resulted in no sales of the records pressed from the master recordings. Consequently no royalties were paid to Levon Records.

Under the strict terms of the distribution agreement, there do not appear to be any financial incentives that would have encouraged Mr. Chiodo to devote full energies to the distribution and promotion of the four master recordings. The agreement entitled SRS to retain an average of 48.25 percent of the revenues received from record sales. The excess was to be paid to Levon Records, which in turn was obligated to pay 60 percent to Common Sense, which itself was obligated to pay 60 percent of its receipts to Chiodo-Scott. Thus, if a record sold for the amount stipulated in the distribution agreement, $1.45 per album, SRS would have been entitled to retain approximately $0.70 from the sale.[38] Additionally Chiodo-Scott would have received approximately $0.27 from each sale.[39] However, the total $0.97 received by Mr. Chiodo from the sale of each album would have been exceeded by his approximate per-album cost of $1.10. Thus, it does not appear from the various agreements that Mr. Chiodo had any incentive to press more records or to spend additional amounts to promote the sale of the records.

Petitioners contend that Mr. Chiodo intended to market the records at a price of $2.98. Assuming this to be so, Mr. Chiodo's revenue per album would have totaled approximately $1.78, yielding him a net return of $0.68 per album, less distribution

---

[38]$1.45 (.4825) equals $0.70.
[39]$1.45 (0.5175) (0.6) (0.6) equals $0.27.

costs. The actual price at which SRS intended to sell the records was not established. As stated, the distribution agreement calls for a price of $1.45 per album. There are various letters and documents indicating that SRS intended to sell the albums for $2.98 each. However, since no albums were ever sold at any price, the only conclusion we reach with respect to the intended marketing price is that there was a great deal of confusion.

What *is* clear from the evidence, however, is that Mr. Chiodo failed to respond to the alleged financial incentives of the acquisition-leaseback agreement. Despite predicting sales exceeding 1.6 million records during the first 3 years, Mr. Chiodo pressed only 1,000 copies of each of the four master recordings. As stated, his subsequent promotional and distributional efforts were unenergetic and soon to be nonexistent. Moreover, SRS failed to perform a number of additional obligations imposed upon it by the distribution agreement.

## Summary and Conclusion

The form of the acquisition and leaseback transaction casts doubt upon the intentions of the promoters and investors who took part in the transaction. We do not recognize from the trial transcript the individuals petitioners describe as having expertise as financial advisers, as record appraisers and as record producers. There is no credible evidence that any of these individuals had had any measure of success in pursuing their particular specialty as applied to the transaction at issue. The estimates of potential sales of the records border on fantasy. It is clear to us that the petitioners failed to make a bona fide effort to investigate the facts surrounding the then-proposed transaction. At some point, naivete becomes a purposeful refusal to analyse the facts, perhaps due to the expectation that the tax benefits, alone, will justify the investment.

Petitioners have failed to show that the transaction entered into by Levon Records was legitimate, that the partnership had some genuine business purpose, and that it was motivated predominantly by concerns other than that of obtaining immediate large deductions and credits at relatively little out-of-pocket cost. Petitioners failed to call any credible expert

witnesses to establish the fair market value of the master recordings.[40] We are unmoved by the conclusory, self-serving testimony of the limited partners that they entered into the partnership with an intention to make a profit. Moreover, our decision in *Brannen v. Commissioner*, 78 T.C. 471, 505 (1982), greatly reduces the relevance of such testimony.

The picture that emerges can lead to only one result. Both the promoters and the partnership washed their hands of the immediate responsibility for marketing the master recordings. Instead, the master recordings ended up where they began, in the hands of Mr. Chiodo, along with $85,000 in cash. From beginning to end, any sales potential depended entirely upon the efforts of Mr. Chiodo and his corporations. These efforts, from the initial production stage to the eventual distribution stage, were wholly unimpressive. There is no evidence that the partnership or anyone acting on its behalf oversaw the activities which constituted the sole source of potential income to the partnership. The partnership's failure to act and to exercise in any way its ownership and contractual rights with respect to the master recordings cannot be reconciled with its alleged profit motive.

Where, as here, the promised tax benefits are suspiciously excessive and the transaction as a whole is entered into and carried out with a complete indifference to profit, it is clear what the parties intended to accomplish. The acquisition and leaseback arrangement was entered into by Levon Records solely for the purpose of reducing the tax burdens of the limited partners involved in the partnership. If anything can be described as an "abusive tax shelter," this is it. Accordingly,

---

[40]A purportedly expert witness for petitioners testified that he had never seen or heard the four records in this case. Nevertheless, he stated that he would pay $250,000 per master recording subject to payment out of sales. He then confidently testified that he could sell 100,000 tapes made from each of the four master recordings. From this amount, under his normal arrangement, he would pay $0.25 per tape to the owner of the underlying master recordings. Thus, he stated, the owner of the master recordings could expect a quarter of a million dollars for each master recording and $1 million for the complete package. It was then pointed out to him by the Court that his mathematical computations were in error and that he would have to sell a million tapes in order to produce $250,000 in royalties to the owner of the master recordings. After but a moment's reflection, the witness stated that he could sell a million tapes from each master recording. The Court was as impressed with the witness's flexibility as it was unimpressed by the substance of his testimony.

we hold that the master recording venture was not entered into by Levon Records with a profit objective.[41]

## Accrued Interest

On the Levon Records partnership return filed for the taxable year 1976, Levon Records took an interest deduction of $10,044 for accrued interest payable to Common Sense. On its 1977 return, Levon Records took a similar deduction of $56,400. This interest was the amount that accrued on the $940,000 nonrecourse note payable to Common Sense by Levon Records.

We have found as a fact that the nonrecourse indebtedness unreasonably exceeded the fair market value of the property acquired primarily with such indebtedness. Where both the purchase price and the lesser principal amount of the nonrecourse note which makes up a portion of such purchase price unreasonably exceed the value of the property acquired, then no "genuine indebtedness" exists and no "investment in the property" occurs. *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975); *Odend'hal v. Commissioner*, 80 T.C. 588, 604 (1983); *Hager v. Commissioner*, 76 T.C. 759, 788 (1981); *Narver v. Commissioner*, 75 T.C. 53 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982); *Beck v. Commissioner*, 74 T.C. 1534 (1980), affd. 678 F.2d 818 (9th Cir. 1982).[42]

Interest is deductible pursuant to section 163(a), which allows a deduction for all interest paid or accrued within the taxable year on indebtedness. Since we have found that the nonrecourse note did not constitute true indebtedness because it lacked economic substance, the requirement of section 163(a)

---

[41]Because Levon Records had no income during the years at issue, sec. 183 is not applicable since that section is an allowance provision. See *Brannen v. Commissioner*, 78 T.C. 471, 500 (1982).

[42]We note that in *Brannen v. Commissioner*, 78 T.C. 471 (1982), on appeal (11th Cir., Aug. 23, 1982), we stated that the test was whether the stated purchase price unreasonably exceeds the value of the property (78 T.C. at 493), whereas in *Hager v. Commissioner*, 76 T.C. 759 (1981), we stated that the test was whether the principal amount of the nonrecourse indebtedness unreasonably exceeds the value of the property (76 T.C. at 773). We do not decide which test is appropriate on the facts before us (see *Brannen v. Commissioner*, 78 T.C. at 513 (Chabot, J., concurring)), because we find that both the purchase price and the principal amount of the nonrecourse debt unreasonably exceeded the value of the master recordings.

that interest must be paid or accrued on indebtedness is not met. Accordingly, the partnership is not entitled to accrued interest deductions for the taxable years 1976 and 1977.

## Deductions for Tax Advice

On its 1976 return, the partnership deducted $12,690 for tax advice. On its 1977 return, it deducted $1,400 for accounting fees and $2,100 for "other professional fees." Petitioners did not make the alternative argument that if their claimed deductions were disallowed on the ground that the master recording transaction was not entered into for profit, the expenses incurred for tax advice should nevertheless be deductible under section 212(3).[43] Accordingly, petitioners failed to present evidence which might entitle them to a deduction under section 212(3).

With respect to the amount deducted for tax advice on the 1976 partnership return, petitioners failed to prove that such amount was not incurred to promote the sale of the limited partnership interests. It appears that a large amount, if not all of this expense, was incurred for purposes of obtaining the tax opinion letter which accompanied the offering prospectus. Section 709(a) provides that no deduction shall be allowed to a partnership or to any partner for amounts paid or incurred to organize a partnership or to promote the sale of an interest in such partnership. Since petitioners failed to prove that the tax advice was incurred for a purpose other than to promote the sale of the limited partnership's interests, it cannot be deducted. With respect to the expenses totaling $3,500 on the partnership's 1977 return, petitioners did not prove the amount of such expenses, if any, that were incurred for tax advice. Accordingly, because they bear the burden of proof (*Welch v. Helvering*, 290 U.S. 111 (1933)), petitioners are not entitled to any deductions attributable to such expenses. Our disposition of the above issues obviates the necessity of addressing the other issues contested by the parties.[44]

---

[43]Sec. 212(3) allows a deduction for all ordinary and necessary expenses paid or incurred in connection with the determination, collection, or refund of any tax.

[44]Our opinion is unaffected by the recent United States Supreme Court opinion in *Commissioner v. Tufts*, 461 U.S. ____ (1983), which held that where a taxpayer disposes of

To reflect the foregoing,

> *Decision will be entered under Rule 155 in docket No. 8336–80; decisions will be entered for the respondent in the remaining docket numbers.*

property encumbered by nonrecourse indebtedness in an amount that exceeds the fair market value of the property, the Commissioner may require him to include the outstanding amount of the obligation in his amount realized. The Supreme Court, relying upon the Commissioner's treatment and over 35 years of judicial sanction, held that the debt should be treated as a true loan. Our situation does not fit within the context of *Tufts* and *Crane v. Commissioner*, 331 U.S. 1 (1947). Our decision is based on the unreasonably and artificially inflated amount of the nonrecourse indebtedness which was not the fact in *Tufts*.