DOUGLAS J. REEDY AND CAROL J. REEDY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Reedy v. Commissioner
Docket No. 9450-83.
United States Tax Court
T.C. Memo 1987-24; 1987 Tax Ct. Memo LEXIS 24; 52 T.C.M. (CCH) 1371; T.C.M. (RIA) 87024; January 12, 1987. Douglas J. Reedy and Carol J. Reedy, pro se. Doreen M. Susi, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined deficiencies and an addition to tax in petitioners' Federal income tax as follows: Addition to Tax
Year
Deficiency
Sec. 6651(a)(1) [1]
1977
$3,171.00
$158.00
1978
1,518.00
*25 The issues for decision are: (1) whether Northwest Jazz, Ltd.'s acquisition of master recordings was an activity engaged in for profit; (2) whether said acquisition lacked economic substance; (3) whether nonrecourse notes should be included in petitioners' partnership basis; (4) whether petitioners may deduct their cost basis under the income forecast method; (5) whether the master recordings were placed in service in 1977 or 1978; (6) whether the useful lives of the master recordings exceed two years; (7) whether legal fees, management compensation and distribution costs must be capitalized; (8) whether the section 6651(a)(1) addition to tax applies; and (9) whether petitioners are entitled to miscellaneous business expenses. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the exhibits attached thereto are incorporated by this reference. Petitioners taught at the Peoria Unified School District in Peoria, Arizona during the years in issue and resided in Peoria, Arizona at the time they filed their petition in this case. On May 31, 1977, petitioners paid $3,000 to acquire a six-unit interest in Northwest Jazz, *26 Ltd. (Northwest Jazz), a limited partnership. Steve Kohner, petitioners' tax-return preparer, informed petitioners of Northwest Jazz. He told them that their initial $3,000 investment would be the full extent of their liability and provided them the following detailed schedule of the tax advantages of a $3,000 investment: Federal
State
1.
Estimated Taxable Income:
$20,000
$20,000
2.
Invest: a. $3,000 in (A) Program at
193% writeoff Plus: Investment
credit of 107% of $3,210.
5,790
5,790
3.
Taxable income after investment
14,210
14,210
4.
a. Taxes were:
4,380
1,181
Total
$5,561
b. Taxes will be
2,766
717
Less: Inv. credit
3,210
Total
717
c. Total Tax Savings this year (a.-b.)
$4,844
d. Plus investment credit carryback
444
e.Total tax savings
5,288
5.
Your original investment
3,000
6.
Difference
2,288
7.
Plus: 2nd Year writeoff in program at 262% * + =
3rd Year writeoff in program at 187% * + =
4th Year writeoff in program at 134% * + =
NOTE: Above figures and benefits are based on estimated income and write-offs *27 and are not guaranteed A private placement memorandum (memorandum) for Northwest Jazz stated that Northwest Jazz was formed to acquire, own and exploit rights to two record albums, "Love Song" and "The Latin Jazz Ensemble." The memorandum warned that the partnership was newly formed and had not previously acquired or exploited any record albums. There was "no assurance that such albums will be an economic success" and "no assurance that substantial amounts, or any other amounts of gross receipts will be obtained * * *." The memorandum stated that Northwest Jazz would sell 159 units at $500 per unit. The net proceeds from the sale of the partnership units were to be applied as follows: Amount
Gross proceeds from sale
of units (1)
$79,500
LESS: Offering Expenses
11,925
$67,575
Net Proceeds from sale of units (1)
LESS: Organization &
Syndication Costs
2,500
Down payment for
purchase of Album
(estimated)
33,000
Management fee
2,000
Payment of Distribution &
other costs
30,075
Total Expenses
$67,575
0
Ted Rush (Rush), the general partner of Northwest Jazz, had no prior experience in the record industry. He had the *28 exclusive right to manage the business affairs of Northwest Jazz and on June 20, 1977, purchased the master recordings entitled "Love Song" and "The Latin Jazz Ensemble" from Prudential Market Corporation (Prudential) for $850,000, payable $33,000 in cash and $817,000 in long-term nonrecourse notes. "Love Song," which a solo jazz musician recorded, and the "Latin Jazz Ensemble," which unknown artists recorded, have a fair market value of $20,000 and $5,000, respectively. The long-term notes were secured only by the albums. The notes provided that interest was to accrue at 6 percent per year and that the noteholder would be paid with receipts from foreign and domestic sales. Long-term, nonrecourse notes are not usually used in the music industry. The contract between Northwest Jazz and Prudential for the purchase of the master recordings did not define the terms "gross receipts" or "net receipts." Contracts usually define such terms to avoid legal problems which may arise if the master recordings are financially successful. The contract failed to provide for any on-going commitment from the "artists" associated with "Love Song" or "The Latin Jazz Ensemble." Contracts usually *29 require such commitments in order that investors can earn a return on their investment from the artists' future successes. Northwest Jazz entered into a distribution agreement with Vee-Jay International Music, Inc. (Vee-Jay) on August 8, 1977. The agreement provided that Vee-Jay had the exclusive right to reproduce, manufacture, distribute, advertise, sell, promote, lease, and otherwise market the phonograph records produced from the master recordings. Vee-Jay originally had sold the master recordings to Prudential. Northwest Jazz earned no income in 1977 and 1978. On their 1977 Federal income tax return, petitioners claimed a $5,512.00 loss and a $1,778.00 investment tax credit with respect to Northwest Jazz. On their 1978 Federal income tax return, petitioners claimed a $7,482.00 loss with respect to Northwest Jazz. Respondent disallowed the losses and investment tax credit for numerous reasons. The deficiencies in question arise because of said disallowances. OPINION Petitioners argue that Northwest Jazz is the first tax shelter with which they have been involved, that their situation is different than that of general partner Rush, and that, therefore, they are entitled *30 to the losses and credits which they claimed. These arguments are irrelevant. The issues for decision are enumerated above. We address only those issues and begin with whether Northwest Jazz' activities were engaged in for profit. Petitioners' right to their claimed losses and investment tax credit is dependent on their showing that Northwest Jazz' activities constituted a trade or business or were undertaken and carried on for the production of income. See Flowers v. Commissioner,80 T.C. 914, 931 (1983). A partnership activity does not constitute a trade or business unless the partnership engages in the activity with the predominant purpose and intention of making a profit. Flowers v. Commissioner,supra.Section 1.183-2(b), Income Tax Regs., provides a list of nine factors to consider in the determination of whether an activity is engaged in for profit. [2] The resolution of the issue is to be based on all the facts and circumstances. Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). The issue of whether an activity carried on by a partnership amounts to a trade or business *31 must be determined at the partnership level. Brannen v. Commissioner,78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984). In the present case, Northwest Jazz was marketed for its tax benefits, not its financial prospects. Ted Rush, the general partner of Northwest Jazz, had no experience in the record industry and purchased the master recordings for Northwest Jazz at a grossly inflated purchase price. [3] Respondent's expert witness testified that Northwest Jazz' contracts did not define important terms or provide for on-going *32 commitments from the artists as is customary in the industry. Northwest Jazz earned no income in either 1977 or 1978. Finally, the record fails to explain why "Love Song" and the "Latin Jazz Ensemble" were selected, why Vee-Jay was selected to distribute the albums, or if Vee-Jay pressed or sold any albums. See Flowers v. Commissioner,supra at 931-942. We conclude that, based on the record before us, Northwest Jazz' activities were not engaged in for profit. [4]
Respondent determined that petitioners were liable for an addition to tax pursuant to section 6651(a)(1). Said section imposes an addition to tax unless it is shown that the failure to file a timely return was due to reasonable cause and not due to willful neglect. *33 Petitioners bear the burden of proof with respect to this issue. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Petitioners have presented no evidence on this issue. Respondent's determination is sustained. Petitioners contend that they are entitled to deduct miscellaneous business expenses which they did not claim on either their 1977 or 1978 Federal income tax return. Petitioners bear the burden of proof with respect to these alleged expenses. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). The record contains no evidence with respect to these expenses and, accordingly, petitioners are not entitled to deduct them. Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended, and all rule references are to the Tax Court Rules of Practice and Procedure.↩
*. Estimated based on current IRS Regulations↩
2. The factors are: 1) the manner in which the taxpayer carried on the activity; 2) the expertise of the taxpayer or his advisors; 3) the time and effort expended by the taxpayer in carrying on the activity; 4) the expectation that assets used in the activity may depreciate in value; 5) the success of the taxpayer in carrying on other similar or dissimilar activities; 6) the taxpayer's history of income or losses with respect to the activity; 7) the amount of occasional profits, if any, which are earned; 8) the financial status of the taxpayer; and 9) whether elements of personal pleasure or recreation are involved.↩
3. Respondent's expert witness, John Wiedenmann, testified that the master recordings "Love Song" and "The Latin Jazz Ensemble" had a fair market value of $20,000 and $5,000, respectively. Petitioners did not contest these values.↩
4. Because Northwest Jazz earned no income and its activities were not engaged in for profit, we need not address respondent's other arguments with respect to Northwest Jazz. See section 183(a).↩