RICHARD A. WATTS AND LAURA M. WATTS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Watts v. Commissioner
Docket No. 18019-84.
United States Tax Court
T.C. Memo 1985-531; 1985 Tax Ct. Memo LEXIS 99; 50 T.C.M. (CCH) 1295; T.C.M. (RIA) 85531; October 15, 1985. Richard A. Watts, pro se. Henry Thomas Schafter, for the respondent. FEATHERSTON
MEMORANDUM *101 FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes and additions to tax: Addition to Tax
Sec. 6653(a),
Year
Deficiency
I.R.C. 1954
1977
$1,198
$ 60
1980
$7,394
$370
The issues for decision are as follows: 1. Whether petitioners are entitled to a deduction for their proportionate share of a loss reported by a partnership, Rainbow IV Ltd., and to their proportionate share of an investment tax credit passed through the partnership to the partners with respect to two master recordings of musical productions; and 2. Whether any part of petitioners' underpayment of tax for 1977 and 1980 was due to negligence or intentional disregard of the revenue laws within the meaning of section 6653(a). [1]
FINDINGS OF FACT Petitioners Richard A. and Laura M. Watts, husband and wife, were legal residents of Edmonds, Washington, when the petition was filed. They filed their joint Federal income tax returns for 1977 and 1980 with the Internal Revenue Service *102 Center, Ogden, Utah. During the years in issue, petitioner Richard A. Watts was the sole proprietor of a business engaged in providing bookkeeping and Federal income tax preparation services. For the sake of convenience, he will be referred to as petitioner. In late 1980 and 1981, petitioner promoted and served as the general partner for the following ten limited partnerships: Rainbow I Ltd.
Venture I Ltd.
Rainbow II Ltd.
Venture II Ltd.
Rainbow III Ltd.
Venture III Ltd.
Rainbow IV Ltd.
Venture IV Ltd.
Emerald Isle Ltd.
Wattston Record Co.
These limited partnerships were organized and interests in them were marketed for individuals with modest amounts of income. Petitioner felt that such individuals should be able to obtain the same tax benefits that, in his view, the wealthy could obtain through tax shelters. Each of the partnerships purportedly acquired master recordings from Jerden Industries, Inc. (Jerden). None of the partnerships ever generated a profit. In addition to being the general partner, petitioner held a 10-percent limited partnership interest in Rainbow IV Ltd. (sometimes referred to as the partnership), which is here involved. *103 Prior to petitioner's acquisition of the master recordings for Rainbow IV Ltd., Jerden furnished to petitioner a document entitled "A Confidential Memorandum" offering master recordings for sale. The memorandum, among other things, sets forth the terms of the offer, describes the risk factors, emphasizes the income tax considerations, and attaches numerous documents including a "Tax Opinion of Seller" and copies of the agreements, listed below, that petitioner signed when Rainbow IV Ltd. acquired the master recordings. On December 29, 1980, Rainbow IV Ltd. purchased two "master recordings" from Jerden for a total stated purchase price of $850,000 as follows: Master No.
Artist
5006
Don Williams
5008
George Jones #2
The stated purchase price of $850,000 was to be paid as follows: (a) $21,000 cash at the time of closing. (b) $21,000 payable by June 29, 1981, and evidenced by a Recourse Promissory Note bearing interest at the rate of 12 percent per annum. (c) $433,000 payable by December 29, 1990, and evidenced by a "Non-Recourse, Non-Transferable Promissory Note" secured by Master No. 5006 Don Williams. (d) $375,000 payable by December 29, 1990, and *104 evidenced by a "Non-Recourse, Non-Transferable Promissory Note" secured by Master No. 5008 George Jones #2. The nonrecourse notes, which imposed no personal liability on the markers, were payable out of 50 percent of the "net revenues" derived by the maker from the exploitation of the master recordings. The term "net revenue" was defined to mean-- all of maker's receipts from the exploitation of such master recordings remaining after maker has deducted the aggregate of (1) maker's costs, if any, of manufacture, sale and delivery of records manufactured from such master recording; (ii) attorneys' fees and collection fees, if any; and (iii) aggregate distribution fees, which distribution fees shall not exceed thirty-five percent (35%) of all such revenues received by maker. The notes were to bear interest at the rate of 10 percent per annum. A purchase agreement dated December 29, 1980, purported, among other things, to convey to Rainbow IV Ltd. the exclusive right to manufacture, distribute, sell, and otherwise market the recordings anywhere in the world. The seller warranted good title to the master recordings. The term "master recording" was defined as follows: " *105 Master recording" means a unique recorded performance embodied on a device used as the prerecorded tape or "master tape" from which is made the mold, metal parts and permanent manufacturing agents from which sound recordings can be manufactured and commercially exploited. Jerden executed a bill of sale, also dated December 29, 1980, transferring and conveying the two master recordings to Rainbow IV Ltd. In addition, on that date, Rainbow IV Ltd. and Jerden executed a security agreement giving Jerden, in the event of default, all of the rights, powers, and remedies available to secured parties under the Uniform Commercial Code of Washington. As general partner on behalf of Rainbow IV Ltd., petitioner on December 29, 1980, also executed a document headed "Sample Sales Agency Agreement" with First American Records, Inc. (First American), designating First American as its agent for a term of 10 years. The agreement contained the following: 3. Agent shall perform the following services: (a) Agent shall market or cause to be marketed albums derived from each of the masters in any and all ways deemed prudent by Agent or its licensed subagents, in its or their best business *106 judgment, including but not limited to sales agreements for albums derived from one or more of the masters, or in combination with one or more other albums for which Agent's services have been engaged, selling albums at whatever prices are deemed advisable by Agent, advertising, airplay and such further uses of said albums as Agent in its judgment believes may result in increasing their sales. With the prior approval of Owner, Agent shall perform for Owner all requisite acts incidental to selling the albums, except for the instances which require prior written approval pursuant to Paragraph 12. (b) Agent shall have or cause albums to be ready for marketing within a commercially reasonable time. * * * (d) Agent shall advance on Owner's behalf all costs of goods and all advertising, publicizing and other selling and distributing costs and expenses. Agent shall be entitled to be reimbursed by Owner out of total gross revenues for costs of goods. * * * (h) Agent shall assure that the appropriate copyright notice showing Owner's name and year of publication is printed on all manufactured records and upon release of each master Agent shall cause it to be registered in the Copyright *107 Office. * * * 6. As compensation for its agency services to be rendered hereunder, Agent shall be entitled to receive thirty-five percent (35%) of total net revenues which are generated from each master.In the event Agent appoints a subagent pursuant to the condition of Paragrph 3, the aggregate fees of Agent and subagent shall not exceed fifty percent (50%) of Owner's net revenues and such limitation shall be observed in computing Agent's gross revenues. * * * 19. As an inducement for Owner to engage Agent, Agent agrees and guarantees to have albums ready for marketing in accordance with Paragraph 3 and further agrees that it will sell or cause to be sold on behalf of the Owner no less than 8,400 * albums per year derived from each master during the terms of this Agreement. * 4,400 for Master 5006 for each of the first five years. * 4,000 for Master 5008 for each of the first five years. As general partner, petitioner executed all of the purchase documents and the sales agency agreement at the same time; the set of agreements were presented as a package deal. Gerald B. Dennon (Dennon) served as director and president of Jerden, from whom Rainbow IV Ltd. purchased *108 the master recordings. He also served as director and president of First American, the designated agent. Petitioner relied upon the representations of Dennon regarding the terms, conditions, and details of the purchase of the two master recordings. He did not hear the recordings prior to the purchase. He did no research on the history of the recorded songs, the chain of title for each recording, or the copyright status of the recordings or the songs. Petitioner made no inquiries as to the financial, technical, or other capabilities of First American to manufacture or market albums produced from the master recordings. Petitioner made no attempt to negotiate the purchase price or the terms and conditions of the purchase and payment. He merely accpeted the prepackaged deal as presented to him. Petitioner made no inquiry as to how many albums would have to be sold to produce enough income to permit him to realize a profit. At the time of petitioner's purchase, a calculation was made of the tax consequences of the acquisition of the master recordings. This calculation was made available "to anybody who had purchased the deal." In connection with the preparation of returns, petitioner *109 disclosed the Rainbow IV Ltd. partnership tax-saving opportunity to his tax return preparation clients and made it available to them. As a general partner and promoter of Rainbow IV Ltd., petitioner received a "one-time" fee of $5,000. He received no other income either as a salary or guaranteed payment from Rainbow IV Ltd. Pursuant to paragraph 19 of the Sample Sales Agency Agreement, quoted above, relating to "guaranteed sales," petitioner received quarterly sales statements from First American covering the period June 1, 1981 to December 31, 1982. These statements reflect that there were no actual sales of albums from the two master recordings through the end of 1982, and, in fact, there were none. On the statements, the partnership was given credit for "accrued sales" from which were subtracted certain accrued matching expenses (reserves for manufacturing costs, sales commissions, talent royalties, and music royalties) that would have been incurred if albums had actually been manufactured and sold in numbers equal to the "guaranteed sales." These statements reflect a "net profit" of 40 cents per album in 1981, 23 cents per album in the first two quarters in 1982, and 17 *110 cents for the last two quarters of 1982. The statements reflect no expenses other than the listed reserves. The purchase price for the master recording provided in the documents signed December 29, 1980, was grossly excessive. The value of the George Jones master recording did not exceed $5,000. The value of the Don Williams recording did not exceed $15,000. The ownership of First American changed in January 1983 and it went into bankruptcy in May 1984. Up to the date of the trial, neither tapes nor albums had been manufactured or sold from the two master recordings owned by Rainbow IV Ltd. In the partnership return for Rainbow IV Ltd. for 1980, the partnership reported a loss of $489. This loss was based on a deduction for depreciation in that amount; an attached schedule K-1 shows that $48.90 of that loss and first-year depreciation of $200 were allocated to petitioner; in addition, the return showed a basis of $850,000 for "Property Qualified for Investment Credit" of which $85,000 (10 percent) was allocated to petitioner on his schedule K-1. On their 1980 Federal income tax return, petitioners claimed, as part of a larger loss from several partnerships, a deductible *111 loss of $249 and an investment tax credit of $7,302 with respect to Rainbow IV Ltd. In addition, petitioners filed an application for tentative refund of $1,198 for 1977 based on a carryback of the unused portion of the investment tax credit claimed for 1980. In the notice of deficiency, respondent disallowed both the deduction of the Rainbow IV Ltd. loss and the claimed investment tax credit for 1980 and the claimed carryback for 1977. OPINION At issue are the deduction taken by petitioner for his share of the 1980 loss reported by the partnership Rainbow IV Ltd. and the investment tax credit and carryback claimed with respect to the partnership's purchase of the two master recordings. The reported partnership loss is attributable entirely to deductions of $489 for depreciation under section 167 and $2,000 for first-year depreciation under section 179. The $249 loss claimed by petitioner reflects his share of the partnership's reported loss. The investment tax credit was computed by using $850,000 as the partnership's basis for the two master recordings acquired in 1980; petitioner's 10 percent of such basis was passed through the partnership to him under section 1.46-3(a), *112 Income Tax Regs., [2] and used in computing the investment tax credit here in dispute. Under section 167(a), the deductibility of a "reasonable allowance" for depreciation turns on whether the master recordings were "used" in a "trade or business" within the meaning of section 167(a)(1). [3] Under section 179, [4] the term "reasonable allowance" as it is used in section 167(a) may, at the election of the taxpayer, include an allowance for the first taxable year for which a deduction under section 167 is allowable of 20 percent of the cost of such property, not to exceed a cost of $20,000 in the case of a joint return. Under section 48(a)(1), the investment tax credit is allowable only for "property with respect to which depreciation (or amortization in lieu of depreciation) is allowable. *113 " Thus, petitioner's right to the patnership loss deduction as well as the investment tax credit depends upon a showing that the activities of Rainbow IV Ltd. from which the deductions arose constituted a "trade or business." See Flowers v. Commissioner,80 T.C. 914, 931 (1983); Pike v. Commissioner,78 T.C. 822, 841-842 (1982), affd. without published opinion 732 F.2d 164 (9th Cir. 1984). *114 A partnership activity does not constitute a trade or business unless the partnership engaged in the activity with the predominant, primary or principal objective of making a profit. Flowers v. Commissioner,80 T.C. at 931; Siegel v. Commissioner,78 T.C. 659, 698 (1982); see also Lemmen v. Commissioner,77 T.C. 1326, 1340 (1981), and cases cited. We must, then, decide whether realizing a return on the investment in the master recordings was the predominant objective of the partnership. The resolution of this issue turns not on one factor alone but must be resolved by considering all the facts and circumstances. Allen v. Commissioner,72 T.C. 28, 34 (1979); Jasionowski v. Commissioner,66 T.C. 312, 319, 321 (1976). Some of the relevant factors to be considered in determining whether an activity is engaged in for profit are listed in section 1.183-2(b), Income Tax Regs.[5] In deciding whether making a profit was the predominant objective of Rainbow IV Ltd., greater weight is given to objective facts than to a mere statement of a taxpayer's intent. Siegel v. Commissioner,78 T.C. at 696-698; *115 Engdahl v. Commissioner,72 T.C. 659, 666 (1979). Based on all of the evidence of record, we find that petitioner has not shown that his predominant purpose or objective was to make a profit on behalf of Rainbow IV Ltd. We are convinced that petitioner's principal purpose and objective were to limit his own tax liability and to make money by marketing what he thought were tax savings opportunities for his tax return preparation clients. Petitioner is not, therefore, entitled to *116 the disputed deductions and investment tax credit. We begin with the fact that petitioner did not handle the purchase of the master recordings in a business-like manner. Sec. 1.183-2(b)(1), Income Tax Regs. Most of the documents--the purchase agreement, the recourse promissory note, the nonrecourse, nontransferable promissory note, security agreement, sample sales agency agreement-signed on December 29, 1980, were forms attached to a "confidential memorandum" issued by Jerden to potential purchasers of its master recordings. The blanks in these prepackaged forms were appropriately filled in but their terms were not changed. In fact, the designation "Exhibit B" was not deleted from the "Purchase Agreement" and the word "Sample" was not even stricken from the heading of the "Sample Sales Agency Agreement." Even though the transaction purportedly involved $850,000, petitioner made no effort to negotiate any terms different from the ones set forth in these prepackaged documents. He had no background or expertise in the music recording business. Yet he consulted no one knowledgeable in the business. Instead, he relied on Dennon, who sold him the deal. As detailed in our findings, *117 he did not hear the master recordings before he bought them; he did no research on the title, copyright, or royalty arrangements burdening the recorded songs; he exercised no judgment as to the number of albums or tapes that would have to be sold to make the deal profitable; he made no inquiry as to the financial or other capabilities of First American to manufacture and market albums and tapes from the master recordings; he obtained no clear understanding of the "guaranteed sales" provisions in the agreement with First American and took no steps to collect any moneys due the partnership from the "accrued sales" that First American reported to him. He made no effort to require First American to begin the manufacture and sale of albums from the master recordings or otherwise to monitor its activities. One thing petitioner did do: he obtained or made computations of the potential tax benefits to be derived from an investment in the master recordings. He used those computations in promoting his partnerships. In fact, petitioner frankly testified that, prior to 1980, "people with large incomes" or people who "had a lot of money, at least were able to take advantage of these so-called *118 tax shelter programs," adding that: We developed a[n] ability for people who were in ordinary income brackets to be able to take advantage of some of these same tax breaks, so to speak, by virtue of creating these limited partnerships. And seemingly it was okay as long as the guys with big bucks did it, but as soon as the guys with little bucks started doing it, and then the government decided it might not be quite so okay. The tax benefits that he sought to arrange for himself and his clients were hardly modest. In his own case, the record as to the amount of his investment is not clear, but he apparently invested $5,000 (which was equal to the amount of the fee he received as general partner). For this investment, he here claims an investment tax credit in the total amount of $8,500 plus the partnership loss deduction of $249 for 1980 alone. [6] Petitioner thus contends that his investment on December 29, 1980, two days before the close of his taxable year, endabled him to almost double his money in the form of tax savings for 1980 alone even though not a single album or tape had been made from the master recordings to the date of the trial. "It was a paradigmatic case of *119 how to win by losing." Barnard v. Commissioner,731 F.2d 230, 231 (4th Cir. 1984), affg. Fox v. Commissioner,80 T.C. 972 (1983). The absence of any use of the master recordings to produce income coupled with these substantial tax benefits is evidence of a lack of profit motive. Flowers v. Commissioner,80 T.C. at 941. The spectacular tax benefits claimed by petitioner were based on the use of the mammoth nonrecourse notes totaling $808,000 compared with only $42,000 in cash and recourse notes, a ratio of approximately 19 to 1. According to the testimony of an expert, nonrecourse notes were not used in the music recording industry for the purchase and sale of master recordings prior to the advent of tax shelter arrangements. [7] The amount of the notes grossly exceeded the fair market value of the two master recordings which, together, had a value of not more than $20,000. *120 The use of large nonrecourse finacing compared with a small cash investment is not necessarily fatal to establishing a profit objective. But we think it is a strong factor working against petitioner because there was no practical probability that the notes would be paid. Barnard v. Commissioner,731 F.2d at 231. Based on the profits "accrued" at rates of 17 to 40 cents per album pursuant to the guaranteed sales provision in paragraph 19 of the purchase agreement, quoted in our findings, an astronomical number of sales of albums would have been required to discharge these nonrecourse notes. We are confident that no one had a bona fide expectation that the notes would ever be paid. There is no evidence that anyone took any steps to produce any income from which they could be paid. We conclude that petitioner has not shown that he had an "actual and honest objective of making a profit" from the master recordings. Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Accordingly, petitioner is not entitled to the claimed partnership loss deduction or investment tax credit.[8]
*121 There remains the issue as to the section 6653(a) additions to tax. That section provides that, if any part of an underpayment of tax is due to negligence or intentional disregard of the revenue laws, a 5-percent addition to tax shall be imposed. We think this addition to tax is clearly applicable. As the head of a bookkeeping and tax return preparation service, petitioner was, or should have been, knowledgeable of the tax laws. His testimony, quoted in part above, that he initiated his 10 limited partnerships, including Rainbow IV Ltd., so that people with modest incomes could shelter their incomes in the same way that, he thought, rich people were able to do so comes close to an admission that he intentionally disregarded the revenue laws in setting up the partnership. Coupling the use of large nonrecourse notes with limited amounts of cash at a ratio of 19 to 1 for an investment in an industry, which customarily does not use nonrecourse financing, is further evidence that petitioner's partnerships went beyond the realm of reasonable tax planning. Claiming a basis of $850,000 for master recordings worth not more than $20,000 without investigating the values of the recordings *122 is further evidence of negligence if not intentional disregard of the revenue laws. Petitioner has not shown that the section 6653(a) addition to tax should not be sustained. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
2. Sec. 1.46-3(a)(1), Income Tax Regs., contains the following language: Section 38 property placed in service [for investment tax credit purposes] by the taxpayer during the taxable year includes the taxpayer's share of the basis (or cost) of section 38 property placed in service by a partnership in the taxable year of such partnership ending with or within the taxpayer's taxable year. * * *↩
3. SEC. 167. DEPRECIATION. (a) General Rule.--There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)-- (1) of property used in the trade or business * * * ↩
4. SEC. 179. ADDITIONAL FIRST-YEAR DEPRECIATION ALLOWANCE FOR SMALL BUSINESS. (a) General Rule.--In the case of section 179 property, the term "reasonable allowance" as used in section 167(a) may, at the election of the taxpayer, include an allowance, for the first taxable year for which a deduction is allowable under section 167 to the taxpayer with respect to such property, of 20 percent of the cost of such property. (b) Dollar Limitation.--If in any one taxable year the cost of section 179 property with respect to which the taxpayer may elect an allowance under subsection (a) for such taxable year exceeds $10,000, then subsection (a) shall apply with respect to those items selected by the taxpayer, but only to the extent of an aggregate cost of $10,000. In the case of a husband and wife who file a joint return under section 6013 for the taxable year, the limitation under the preceding sentence shall be $20,000 in lieu of $10,000. * * * (d) Definitions and Special Rules.-- * * * (8) Dollar limitation in case of partnerships.--In the case of a partnership, the dollar limitation contained in the first sentence of subsection (b) shall apply with respect to the partnership and with respect to each partner. * * * W. McKee, W. Nelson & R. Whitmire, Federal Taxation of Partnerships and Partners, sec. 10.04[2] (1977), explains: Section 179 permits the owner of qualifying property to elect to claim additional first-year depreciation equal to 20 percent of the cost of the property, subject to certain dollar limitations on the amount of eligible qualifying property. A partner's distributive share of section 179 first-year depreciation is based on his distributive share of the partnership's section 167 depreciation allowance, which, in turn, is governed by section 704. Section 179 depreciation, therefore, cannot be allocated as a separate item; instead, it must be apportioned according to the partners' shares of section 167 depreciation in the section 179 property. [Fn. refs. omitted.] If the depreciation deduction is not subject to a special allocation, a partner's share of depreciation is determined according to his sec. 702(a)(8) profit and loss ratio.↩
5. The factors listed in sec. 1.183-2(b), Income Tax Regs.↩, include: (1) Whether the taxpayer carried on the activity in a business-like manner; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.
6. Schedules K-1 attached to the partnership returns of Rainbow IV Ltd. for 1981 and for 1982 show petitioner's share of the loss to be $4,616.30 for 1981 and $104.80 for 1982.↩
7. Thomas Bonetti testified that as an entrepreneur he had brokered over a thousand master recordings and an equal number as an employee of GRT Corporation. He testified: THE COURT: --is it the practice in the industry to make sales and use as part of the consideration, non-recoursed [sic] notes? THE WITNESS: No, Your Honor. The only time I have ever heard of this, is in these so called promotions sold to investors. THE COURT: Have you in your experience, ever entered into a transaction with a non-recoursed [sic] note given? THE WITNESS: Never.↩
8. Respondent offers other arguments in support of his position which we find unnecessary to consider.↩