WILLIAM C. MILLAR AND BARBARA S. MILLAR, ET AL., [1] Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent Millar v. Commissioner
Docket Nos. 27794-81, 27795-81, 27921-81, 27962-81, 1303-82, 13485-82.
United States Tax Court
T.C. Memo 1986-592; 1986 Tax Ct. Memo LEXIS 12; 52 T.C.M. (CCH) 1200; T.C.M. (RIA) 86592; December 22, 1986. Howard K. Schwartz and Patrick John Gray, Jr., for the petitioners. Beth L. Williams, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: In these consolidated cases, respondent determined the following deficiencies in, and additions to, petitioners' Federal income taxes: Addition to Tax
Docket No.
Taxable Year
Deficiency
Sec. 6651(a)(1) [2]
27794-81
1976
$2,872.00
27795-81
1976
760.00
1977
6,819.00
1978
13,061.44
27921-81
1976
775.00
1977
8,681.32
1978
2,178.42
27962-81
1976
1,615.00
1977
9,672.35
1978
7,330.10
1303-82
1976
2,050.38
1977
15,339.89
13485-82
1976
460.00
$115.00
1977
7,593.00
612.00
1978
17,761.00
4,440.00
The issues for decision are: (1) Whether *14 the activities of Hybrid Vehicle Limited Partnership with respect to a patent license constitute activities engaged in for profit; (2) Whether Hybrid Vehicle Limited Partnership placed the patent license in service during the years in issue; (3) Whether the $2,130,000 nonrecourse debt executed by Hybrid Vehicle Limited Partnership pursuant to its exclusive license with Patent Systems, Inc. is includible in the depreciable basis of the patent license; (4) Whether the $335,000 recourse debt executed by Hybrid Vehicle Limited Partnership is a bona fide indebtedness of the Partnership; (5) Whether, if Hybrid Vehicle Limited Partnership used the patent license in a trade or business and its value exceeds the $2,500,000 license fee, the allowance for depreciation is limited to royalties actually paid during the years in issue; (6) Whether legal fees of $4,500 paid to Leo H. Angelos and Gerald Schneider in 1976 constitute non-amortizable organization or syndication fees pursuant to sections 709(a) and 263; (7) Whether Hybrid Vehicle Limited Partnership may claim interest deductions in 1977 and 1978; and, (8) Whether petitioners Leo H. Angelos and Carey Angelos are liable for *15 additions to tax pursuant to section 6651(a)(1) for failure to timely file their individual income tax returns for the years 1976, 1977 and 1978. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Background
At the time of the filing of their petitions, petitioners at docket Nos. 27794-81, 27795-81, 27921-81, 27962-81, and 13485-82, resided in Ann Arbor, Michigan. At the time of filing of the petition at docket No. 1303-82, Sophia Wilseck, as personal representative for the estate of Francis S. Wilseck, resided in Utica, Michigan. Each of the petitioners filed their respective returns for the years in issue utilizing the cash receipts and disbursements method of accounting. The returns of petitioners Leo and Carey Angelos and the following due dates and filing dates. Taxable Year
Due Date [3]
Filing Date
1976
4/15/77
12/22/78 1977
6/15/78
1/03/79
1978
6/15/79
9/27/79
*16 During the years in issue, petitioner Robert Tisch was a sales manager for the general agency of the Equitable Life Assurance Society of the United States, for which petitioner William Millar was a general agent. During the years in issue, petitioner Sotirios Roumanis was engaged in business as a restaurant owner and manager. From 1976 until the date of his death in 1978, petitioner Francis Wilseck was engaged in the construction business as a general contractor. Before and during the years in issue, petitioner Leo Angelos was licensed to practice law in the state of Michigan and maintained a law office in Ann Arbor, Michigan. United States Patent No. 3,792,327 (the "patent") was issued to Lindsey Waldorf ("Waldorf") on February 12, 1974. The patent was issued for a hybrid electrical vehicle drive, a drive utilizing both an electric motor and a traditional combustion engine. As of the time of trial, the specific hybrid vehicle design concept described in the patent had never been physically tested in any manner. No prototype or working model of the vehicle had ever been built. No computer simulation of the vehicle had ever occurred, nor had physical models of the drive components *17 been constructed. The Partnership
Hybrid Vehicle Limited Partnership (the "Partnership") was organized on December 30, 1976, under the laws of the state of Michigan by the filing of a Limited Partnership Agreement. The partnership adopted the cash receipts and disbursements method of accounting for its 1976, 1977 and 1978 taxable years. At all times relevant herein, Leo H. Angelos ("Angelos") was the sole general partner of the Partnership and held a 10 percent interest therein. During the years in issue, the limited partners held the following percentage interests in the Partnership: Limited Partner
Percentage Interest
Alex G. Karras
19.38%
Dennis Serras
13.85 William Millar
13.85 Francis Wilseck
13.85 Tom G. Vance
8.31
Robert R. Tisch
6.92
Sotirios Roumanis
6.92
Barry A. Breakey
6.92
The amount of cash invested by each of the limited partners was as follows: Limited Partner
1976
1977
1978
1979
1980
Total
Alex G. Karras
$ 7,000
$ 0  $15,812
$ 0  10,748
$ 33,560
Dennis Serras
5,000
0  10,500
5,000
2,000
22,500
William Millar
5,000
0  13,125
13,125
0  31,250
Frances Wilseck
5,000
0  13,125
0  0  18,125
Tom G. Vance
3,000
0  6,937
0  4,613
14,550
Robert R. Tisch
2,500
0  [4] 6,562
6,563
0  15,625
Sotirios Roumanis
2,500
[5] 6,000
150
2,000
0  10,650
Barry A. Breakey
2,500
0  4,500
0  0  7,000
$32,500
$6,000
$70,711
$26,688
$17,361
$153,260
*18 As of 1976, Angelos had no background in patent law or in the licensing of patents. Angelos had no scientific, technical or engineering experience and had no experience in the fields of automotive engineering, automotive marketing, electrical or mechanical engineering or electronics. On December 6, 1976, Angelos contacted Jerold I. Schneider of the law firm of Cullen, Settle, Sloman & Cantor, specializing in patent law, and requested him to investigate the validity and enforceability of the patent and make a full report and evaluation of the patent. Schneider's report concluded that the patent was valid and that the fair market value of a proposed 7 year exclusive license of the patent was in the range of $1,100,000 to $11,300,000. The report valued the patent license by: (1) identifying 8 levels of market penetration over the 7 year life of the proposed patent license; *19 (2) using the above to estimate the number of vehicles that would be manufactured during the 7 years period utilizing the patent's drive concept; (3) estimating a single figure for the total per vehicle wholesale cost of the components in these vehicles which would be covered by the patent; and (4) for each level of market penetration, multiplying the number of vehicles sold by the cost of the patented component parts, and multiplying this figure by royalty percentages ranging from one-half percent to five percent. Based on the above figures, the report determined the fair market value of the patent license by treating it as falling within the range of income streams which might be produced by the patent license. The report did not discount the potential streams of income in order to determine the fair market value of the patent license. Nor did the report attempt to predict the likelihood of any particular stream of income being realized. The report also ignored the possibility that the purchaser of the license would realize zero income from the license. The report stated that this possibility was ignored because "every patent license is subject to this risk and hence the fair *20 market value of every patent would be zero." Prior to seeking this report, Angelos did not inquire into Schneider's qualifications for making market projections or determining the fair market value of patents or patent licenses. Nor did Angelos consult with an engineer regarding the patent, or the hybrid vehicle concept generally. The Patent License
Patent Systems, Inc., (PSI") was a Michigan corporation incorporated on December 15, 1976. Eugene Hanlon ("Hanlon") was the president and sole officer of PSI during all periods in issue. Hanlon was a lawyer in Ann Arbor and a business associate of Angelos in other matters. On December 15, 1976, [6] Hanlon, on behalf of PSI, and Angelos, on behalf of the Partnership, executed an agreement conferring upon the Partnership the exclusive worldwide rights to exploitation of the patent, for a period of seven years. PSI was identified in the agreement as the owner of the patent by assignment and warranted that it owned title to the patent free and clear of all encumbrances. PSI had acquired the patent in exchange for its agreement to pay to Waldorf 95 percent of any income received by it from exploitation of the patent. *21 The stated consideration due from the Partnership was $2,500,000. Payment was to be made as follows: (1) $35,000 cash paid at closing; (2) $335,000 paid by promissory note, such amount to be paid in full before December 1, 1981, and bearing interest on the unpaid balance at an annual rate of 7 percent; [7] and (3) the balance of $2,130,000 paid with a nonrecourse promissory note payable out of 30 percent of the gross income received by the Partnership from the sale or license of its interest in the patent. The nonrecourse note had a 7-year term and the unpaid balance was to earn interest at 7 percent per annum. The agreement further provided that the Partnership would grant PSI a security interest in all property of the Partnership to secure its indebtedness to PSI and would execute any documents necessary to record such security interest. *22 The license agreement also provided an option for the Partnership to renew the license on a non-exclusive basis upon the expiration of the 7-year period. In order to exercise the option, the Partnership would be required to pay PSI a renewal fee equal to the greater of 3 percent of the income received by the Partnership from exploitation of the patent during the original term of the license, or $50,000. The term of the renewal period was to be the remaining life of the patent and, upon exercise of the option, the maturity date of the nonrecourse note would be extended until the end of the renewal term. In addition, if during the renewal period the total cumulative royalties received by the Partnership from the date of the execution of the licensing agreement exceeded $10,000,000, the Partnership would be required to pay PSI 50 percent of all income received from exploitation of the patent thereafter. Investment Description
Potential investors in the Partnership were given a document entitled "Patent License Investment Description 1976." The document purported not to be a prospectus or an offer. The cover sheet of the document stated that interests would be offered on *23 a private basis only and at the sole discretion of the general partner. The purpose of the Partnership was identified as being the purchase of an exclusive license to the inventions claimed in the patent. The document briefly described the hybrid vehicle design which was the subject of the patent and also enumerated the advantages which the "Inventor believes the Hybrid Vehicle will offer * * * over present motor vehicles." The document gave no independent analysis or verification of these advantages. The terms of the license agreement was set out in the investment description. The license being granted was described as an exclusive license for a period of 7 years covering the rights to make, use and sell commercial products and to sublicense the patent. The investment description did not, however, identify any plans for utilizing the patent for production or sublicensing, nor did it identify a source of capital which the Partnership could use to accomplish such production or sublicensing. A section of the investment description headed "Economic Risk Factors" stated that the investment was highly speculative and that the receipt of any royalties by the Partnership could not *24 be predicted with any certainty. This section of the document reiterated the inventor's beliefs about the advantages of the hybrid vehicle design and then stated that, in light of the economic and regulatory conditions at the time, "there would appear to be a substantial market for [these] vehicles * * * if the inventors beliefs prove to be correct and accurate." The remainder of the economic risk section enumerated some of the specific risk factors of investment as follows: (1) the patent, while issued, had not been judicially tested; (2) a prototype had not been completed, no firm commitment had been obtained for the construction of a prototype, and even if a prototype were constructed, there was no assurance that it would operate in a satisfactory manner or that consumers would accept a hybrid vehicle; (3) no revenue would be received by the Partnership with respect to the construction of a prototype; (4) many large and well financed companies had already committed substantial resources to research and development programs which might produce vehicles directly competitive with any vehicle produced from the patent; and (5) no assurances could be given that substantial revenue *25 would be produced during the life of the license or that the substantial additional investment required to exercise the option to extend the term of the license would seem economically justified at the time the option became exercisable. The investment description stated that the Partnership would have a $2,500,000 depreciable tax basis in the license and would be able to use straight-line depreciation over 7 years. This would give the Partnership a deduction of $357,142 per year. The investment description warned, however, that if the patent license was not extended, "recapture" of the depreciation deductions could occur at the end of the 7-year period to the extent that the principal on the nonrecourse note remained unpaid. The investment description also stated that the renewal option was structured to give each investor the choice of renewing his share of the option. In a portion of the investment description dealing with the challenges the Internal Revenue Service might make to the Partnership's tax deductions, the document stated that one such challenge might be that the fair market value of the patent license was insufficient to support the depreciation deductions. The *26 document then stated: The question then becomes what is the fair market value of the license. Of course, the nature of the license interest is such that it is very difficult to ascertain "true fair market value." Since the definition of fair market value is "the price to be paid by a willing buyer to a willing seller," and since its [sic] fair to conclude that there is a willing buyer and seller in this transaction, presumptively the price paid (the $2,500,000) should be the fair market value. In no other portion of the document was it alleged that the $2,500,000 purchase price was in fact the fair market value of the patent license. Nor did the investment description explain how this price had been chosen. Potential investors in the Partnership also received a single page document containing the following schedule: INVESTMENT
Balance
Cash
Interest
Principal
Note
1976
[8] 40,000
35,000
365,000
1977
100,000
25,550
74,450
290,550
1978
100,000
20,338
79,662
210,888
1979
100,000
14,762
85,238
125,650
1980
100,000
8,795
91,205
34,445
1981
[9] 33,856
2,411
34,445
473,856
[10] 400,000
TAX DEDUCTIONS
Tax
Beneficiary
Depreciation
Interest
Total
at 50%
1976
29,671
29,671
14,835
1977
357,142
25,550
382,692
191,346
1978
357,142
20,338
377,530
188,765
1979
357,142
14,762
371,904
185,952
1980
357,142
8,795
365,937
182,968
1981
357,142
2,411
359,553
179,776
1982
357,142
357,142
178,571
1983
327,381
327,381
163,690
1,285,903  *27 Renegotiation of the License
During the years 1976 through 1981, the payments made by the Partnership to PSI and the payments which the Partnership was required to make to PSI pursuant to the installment note executed by Angelos were as follows: Year
Payments Made
Payments Reguired
1976
$22,500.00
$ 35,000.00
1977
5,000.00
100,000.00
1978
73,150.00
100,000.00
1979
29,687.50
100,000.00
1980
20,000.00
100,000.00
1981
1,000.00
36,856.00
$151,337.50
$471,856.00
Beginning in early 1978, Angelos, the limited partners, and PSI began receiving letters from Waldorf and Howard K. Schwartz, an attorney representing Waldorf, complaining of the Partnership being in arrears on the installment note and threatening to bring suit to collect. These letters also stated that if Waldorf was forced to *28 foreclose on the Partnership, recapture of the depreciation deductions taken by the Partnership would occur. In response, Angelos began encouraging the limited partners to pay in amounts which were due the Partnership. In August and September of 1979, a set of agreements was executed in settlement of the dispute between Waldorf, PSI and the Partnership. One of the agreements substituted a corporation named Patent Licensing International, Ltd. ("PLI") into the position of PSI with respect to Waldorf and the Partnership. This agreement was executed by Schwartz as president of PLI and Hanlon as president of PSI. PSI assigned all of its rights in the patent to PLI and also assigned all of its rights and delegated all of its duties with respect to its agreements with Waldorf and the Partnership to PLI. A second agreement executed between the Partnership and PLI altered the terms of the agreement originally executed between the Partnership and PSI. This agreement amended the earlier agreement as follows: (1) the original purchase price of $2,500,000 was decreased to $2,332,000, of which $35,000 was stated to have been paid at the time of the execution of the 1976 agreement; (2) $475,000 *29 of accrued and unpaid interest was stated to be owing on the promissory notes given in connection with the 1976 agreement; (3) upon execution of the 1979 agreement, the Partnership was to pay to PLI an amount equal to the difference between $168,000 and the amount paid by the Partnership prior to the date of the 1979 agreement, exclusive of the $35,000 down payment; [11] (4) the balance owing of $2,604,000 [12] (principal and interest) was to be paid with a new promissory note earning interest at 7 percent per annum on the unpaid balance and payable out of 70 percent of the income received by the Partnership from exploitation of the patent; (5) the term of the exclusive license was extended to the life of the patent; and (6) if the total amount due on the promissory note was paid in full during the extended term of the license, the Partnership was to pay PLI 50 percent of the income it derived from the patent thereafter. *30 The payment which was to be made by the Partnership upon the execution of the agreement with PLI was not made. Further, the $2,604,000 promissory note was nonrecourse and no portion of it had been paid as of the time of trial. Operation of the Partnership
From its inception in 1976 until at least the time of trial, the Partnership owned no property and had no assets other than its interest in the patent license. Nor did it have any capital which could be used to develop the invention. The Partnership did not maintain any formal offices and had no employees. The address used by the Partnership on its returns for 1976 and 1977 was the site of the law office of Angelos during those years. During the years 1976 to 1980, the Partnership did not sell, license, or market the hybrid vehicle design claimed in the patent. The Partnership made no formal offers to anyone to sublicense the patent and received no offers from anyone expressing an interest in sublicensing the patent or acquiring rights to use the invention. No advertisements or similar published matter pertaining to the invention claimed in the patent have ever been printed or placed by the Partnership. The Partnership *31 has not paid or incurred any expenditures with respect to the patent license or the invention, except for the expenditures made to acquire the patent license. The Partnership made no significant expenditures and incurred no significant expenses to: (1) develop a prototype of the invention; (2) market, sublicense, or sell the invention; (3) develop a working model of the invention; or (4) interest any other person or entity in developing the invention. No estimate of the cost of manufacturing vehicles in production quantities utilizing the invention or of the price at which such vehicles could be sold has ever been made by or on behalf of the Partnership. The Partnership has paid no royalties to PSI or any other party. The Partnership has never realized any income or royalties from the patent license or from any other source. It reported zero receipts and zero gross income on each of its returns for 1976 through 1980. Trafalger Limited
Trafalger, Ltd. ("Trafalger") was a Michigan corporation incorporated on April 8, 1977. At all times relevant, Howard K. Schwartz was the president and a 76 percent shareholder of Trafalger. Waldorf owned 24 percent of the capital stock *32 of Trafalgar and was its only other shareholder. Neither the Partnership nor any of its partners held any interest in Trafalger. Jet Propulsion Laboratory ("JPL"), under a subcontract with the United States Department of Energy, issued a solicitation for contract bids for Phase I of a "near term hybrid vehicle" on November 18, 1977. Trafalger submitted a three-volume proposal to JPL in March 1978, entitled "Proposal No. HI-2-8275, Phase I of a Near Term Hybrid Passenger Vehicle." Waldorf was the principal author of the proposal. Trafalger was notified in May 1978 that JPL had rejected the proposal. At no time has there been a written agreement, a written contract, or a memorandum or writing evidencing an oral agreement between Trafalger and the Partnership, or any partner therein, with respect to the patent or any license of the patent. OPINION As a preliminary matter, petitioners have raised the argument that respondent's deficiency determination is arbitrary and capricious and should not be accorded the normal presumption of correctness. Petitioners base this argument on one of respondent's alternative grounds, stated in the notices of deficiency, for the disallowance *33 of the Partnership's losses. In the notices of deficiency respondent, as one of several alternatives, disallowed the Partnership's claimed deductions because of a failure of petitioners to prove that "The underlying theory set forth in the patent was a viable alternative for propelling a vehicle and, therefore, had marketability." Petitioners argue that in order for the United States Patent Office to issue a patent it must determine that the invention described in the patent application will work. Further, petitioners argue that respondent's determination that the invention is not "viable" is in effect a determination that the patent is invalid. Petitioners conclude that because respondent does not have standing to challenge the validity of a patent [13], his determination in this case is arbitrary and capricious. Respondent's determination clearly goes to the marketability of the patent and not to its validity as a matter of patent law. As petitioners have not claimed that the United States Patent Office must determine that a patent will be marketable prior to its issuance, we will *34 not interpret respondent's determination as going to the validity of the patent. Accordingly, we do not accept petitioners' argument that the notices of deficiency are arbitrary and capricious. Depreciation
In order for the Partnership to be entitled to the claimed amortization of the cost of the patent license, petitioners must prove that they acquired a patent license which was used in a trade or business or held for the production of income. Sec. 167(a); Rule 142(a). A partnership's activities constitute a trade or business if the partnership is engaged in the activities with the predominant purpose and intention of making a profit. Flowers v. Commissioner,80 T.C. 914, 931 (1983); Siegel v. Commissioner,78 T.C. 659, 698 (1982). While the partnership's profit making expectations need not necessarily be reasonable, its profit objective must be in good faith. Flowers v. Commissioner,supra;Allen v. Commissioner,72 T.C. 28, 33 (1979). The existence or absence of the requisite profit objective is determined *35 at the partnership level. Brannen v. Commissioner,78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984). The determination is to be made based on a consideration of all the facts and circumstances. Flowers v. Commissioner,supra at 931-932. Greater weight, however, should be placed upon objective facts than mere statements of intent. Brannen v. Commissioner,supra at 506. Section 1.183-2(b), Income Tax Regs., lists some of the factors which should be considered in determining whether an activity is engaged in for profit. The list is not intended to be exclusive and the weight given any particular factor may very depending on the circumstances. These factors include: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectations that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with *36 respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. In this case, the Partnership's activities consisted of little more than the purchase of the patent license. Following the purchase of the license the Partnership engaged in no activities other than the general partner's unsuccessful attempts to prod the limited partners into making the contributions to the Partnership which were needed to pay the Partnership's recourse obligations to PSI and his renegotiation of the licensing agreement when it became apparent that the Partnership would not meet its obligations to PSI. The Partnership made no attempts to exploit the patent in a profitable manner. Nor did the Partnership have any resources with which to exploit the patent. Angelos had no background in the fields of automotive engineering, automotive marketing, electrical or mechanical engineering, or electronics. Nor did Angelos have any background in patent law or in the licensing of patents. Angelos allegedly relied on the expertise of Waldorf as to technical matters and on *37 Schneider as to matters relating to patent law and the value of the patent. With respect to Angelos' reliance on Waldorf, we note that with respect to negotiation for the license, Waldorf was a party with economic interests adverse to those of the Partnership. Almost all of the payments to be made to PSI were to be paid over to Waldorf. As such, Angelos' reliance on Waldorf as a technical advisor would not be reasonable during the negotiation for the license. Further, there is little evidence in the record to suggest that Angelos actually sought technical advice from Waldorf. Angelos' reliance on advice from Schneider, beyond the report which Angelos sought from Schneider, is similarly unproven. As to Schneider's report, we find its utility as a basis upon which to make economic decisions to be questionable. The report equated potential income stream with fair market value. Further, while suggesting a potential range of income streams varying by more than a factor of 10, it gave no predictions of the likelihood of any particular level of income being realized. We find it difficult to accept that any prudent businessman would place his reliance on this report, especially where *38 the background and qualifications of the preparer were not investigated. Once the purchase of the patent license had been completed Angelos expended almost no time in the exploitation of the patent. The activities of the Partnership were negligible once the purchase was completed. Angelos testified that the books and records of the Partnership consisted of a checking account. He also stated, in explaining why the Partnership did not need an office, that "This was a project that occupied a file drawer for me." The record clearly shows that Angelos' activities were minimal with respect to the patent and the Partnership in general. Based on the above considerations alone we find that the Partnership clearly did not purchase the patent license for use in a trade or business or for the production of income. The alleged purchase price of $2,500,000 was established to achieve desired tax benefits. The terms of the Partnership agreement and the terms of the purchase agreement were designed not to create economic profits but to create amortization deductions in the amount of $2,500,000 over 7 years while allowing the recapture of these deductions to be postponed for an additional 10 *39 years (the remaining life of the patent). Accordingly, we hold that petitioners are not entitled to the claimed amortization deductions in any of the years in issue. [14]
Legal Fees
Petitioners have conceded that there is no evidence in the record to demonstrate the purpose behind the legal fees allegedly paid to Angelos and that, therefore, those amounts are not properly deductible by the Partnership. Petitioners have also conceded that the amounts paid to Jerold I. Schneider were start up costs of the Partnership. Because of our holding that the Partnership was not engaged in an activity for profit, the deduction of such amounts are not allowable whether or not they are subject to the provisions of section 709. Secs. 165(c), 212. Interest
Also at issue is whether the Partnership may claim interest deductions for the years 1977 and 1978. As a preliminary matter, respondent asserts, and petitioners concede, that the Partnership should properly have been on the cash receipts and disbursements method of accounting *40 during the years in issue and therefore the Partnership was not entitled to deduct amounts representing accrued but unpaid interest. Thus, we need only resolve the proper treatment of amounts actually paid during the years in issue. The amounts actually paid by the Partnership pursuant to the licensing agreement during the years in issue were as follows: Year
Payments Made
1976
$22,500.00
1977
5,000.00
1978
73,150.00
$100,650.00
The burden of proof is upon petitioners to establish the character of these payments. Rule 142(a). Respondent points out that the licensing agreement required that the Partnership pay a down payment in the amount of $35,000 and that the renegotiation and settlement agreement stated that this amount had been paid. There is insufficient proof in the record to establish that the first $35,000 of payments made by the Partnership were other than the down payment required by the licensing agreement. We therefore narrow our consideration to the characterization of $18,091 claimed by the Partnership in 1978 as an interest deduction. Respondent has challenged the Partnership's entitlement to the interest deductions on the grounds *41 that (1) the debt upon which the payments were made was not a bona fide debt and (2) the petitioners failed to establish the character of the payments. The parties agree that the payments made by the Partnership were not made pursuant to the nonrecourse debt of the Partnership. Clearly, all such amounts were either the down payment on the purchase or payments made pursuant to the recourse debt. After reviewing the facts of this case, we are convinced that the recourse debt of the Partnership was not a bona fide debt. The recourse debt was an obligation to a corporation which was controlled by a business associate of Angelos. Even though the Partnership was in arrears on payments owed to PSI during all of the years in issue, there is no evidence in the record to indicate that Hanlon, as president of PSI, ever attempted to enforce the debt against the Partnership.At the end of 1978, the Partnership was over $130,000 in arrears on its payments owed to PSI. In addition, while Waldorf may have had some right to enforce the debt as a third party beneficiary, Waldorf's efforts to do so were minimal. The evidence shows that Waldorf did little more than have his attorney, who was extensively *42 involved in many aspects of the transaction, write letters threatening to bring suit to enforce the obligation and forceclose on the patent license, thereby triggering recapture of the Partnership's deductions. When the Partnership proved unresponsive to these letters, Waldorf agreed to renegotiate the deal rather than attempting to enforce the obligation. The renegotiated agreement effectively released the Partnership from its liability to pay $167,000 of the $335,000 originally agreed to be paid by installment note. Further, while the renegotiated agreement called for the Partnership to pay $80,162.50 on the execution of the agreement, the Partnership failed to pay this amount at that time. As of the end of 1981, $51,662.50 of this amount had still not been paid by the Partnership. Petitioners have clearly failed to show that the debt in question was treated as a bona fide debt by the parties. Accordingly, petitioner's interest deduction for the year 1978 is not allowable. Late Filing Additions
The final issue for decision is whether petitioners Leo H. Angelos and Carey Angelos are liable for additions to tax pursuant to section 6651(a)(1) for failure to timely file *43 their individual income tax returns for the years 1976, 1977 and 1978. Section 6651(a)(1) provides that a taxpayer who fails to file a return which is timely is subject to an addition to tax of 5 percent of the amount required to be shown as tax on the return for each month the return is overdue. The addition to tax is limited to a maximum of 25 percent. The addition is not applicable, however, if the taxpayer can demonstrate that the delay in filing the return is due to reasonable cause and not due to willful neglect. The returns of petitioners Leo and Carey Angelos had the following due dates and filling dates: Taxable Year
Due Date
Filing Date
Months Late [15]
1976
4/15/77
12/22/78
21
1977
6/15/78
1/03/79
7
1978
6/15/79
9/27/79
4
Petitioners have offered no evidence tending to show that their delays in filing were due to reasonable cause and not due to willful neglect. Petitioners *44 have also not briefed the issue. Accordingly, we hold that petitioners are subject to the additions to tax as determined by respondent. Decisions will be entered for the respondent.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Robert R. Tisch and Jennifer S. Tisch, docket No. 27795-81; Sotirios Roumanis, docket No. 27921-81; Dennis Serras, docket No. 27962-81; Estate of Francis Wilseck, Deceased, a/k/a Frank Wilseck, Sophia Wilseck, Personal Representative, docket No. 1303-82; Leo H. Angelos and Carey A. Angelos, docket No. 13485-82.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
3. Respondent has conceded that the due dates of the 1977 and 1978 returns were extended to the listed dates.↩
4. The stipulated exhibit identifying the amounts paid into the partnership indicates that this amount was not deposited to the partnership's bank account. This amount was deposited to Angelos' private bank account as a partial repayment of a loan made by him to the partnership. ↩
5. See supra,↩ Note 4.
6. This was 15 days before the Partnership was organized.↩
7. The promissory note actually executed by Angelos on behalf of the Partnership was in the face amount of $400,000. This amount included the $35,000 down payment, but the additional amount of $30,000 is unexplained. The amount of the nonrecourse note was not decreased by this amount. The parties have attached little relevance to this discrepancy.↩
8. The reason for this figure being $5,000 larger than the sum of the principal and interest is unexplained. ↩
9. This figure should apparently be $36,856, the sum of the principal and interest to be paid in 1981. ↩
10. This figure matches the principal amount stated in the promissory note rather than the amount stated in the licensing agreement.↩
11. As of September 18, 1979, the date this agreement was executed, the Partnership had made total payments to PSI, in excess of the $35,000 down payment, of $87,387.50. Therefore, the Partnership should have paid an amount on closing of $80,162.50 ($168,000.00 - $87,837.50). ↩
12. This was calculated as follows: ↩
Adjusted Purchase Price
$2,332,000 Plus: Accrued and unpaid interest
475,000 Less: Closing and prior note payments
(168,000)
Less: Down payment
( 35,000)
$2,604,000 13. See Differential Steel Car Co. v. Commissioner,T.C. Memo 1966-65↩.
14. Our disposition of this issue makes it unnecessary to deal with any of the issues relating to the Partnership's amortization of the patent license.↩
15. In determining the number of months late which a return has been filed, a fraction of a month is treated as an additional month. Sec. 6651(a)(1)↩.